STATE OF NEBRASKA, APPELLEE, V. DARRIN MCHENRY,
APPELLANT.

550 N.W.2d 364

Filed July 12, 1996.    No. S-95-782.

Richard A. Birch, of Nielsen & Birch, and Patrick B. Hays for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

WRIGHT, J.
Darrin McHenry appeals his convictions of aiding and abetting first degree murder and aiding and abetting attempted robbery. We affirm in part, and in part vacate.

## SCOPE OF REVIEW

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Ryan*, 249 Neb. 218, 543 N.W.2d 128 (1996); *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996); *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995).

Except when there is a showing that without sequestration a party's rights would be prejudiced, a party has no right to examine a potential juror out of the presence of all the other potential jurors. *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993).

A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. McHenry, supra*; *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993).

A trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair trial. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

## FACTS

McHenry was arraigned in the district court for Lincoln County on August 4, 1993, and was charged in an amended information with four counts regarding his involvement in the death of Richard Sterkel—aiding and abetting first degree murder, aiding and abetting attempted robbery, first degree sexual assault, and aiding and abetting first degree sexual assault. On September 16, a jury convicted McHenry of the first three counts and acquitted him of aiding and abetting first degree sexual assault. On appeal, we set aside McHenry's convictions and remanded the cause for retrial. See *State v. McHenry, supra*. In McHenry's second jury trial, he was found guilty of aiding and abetting first degree murder and aiding and abetting attempted robbery, and found not guilty of first degree sexual assault. The district court sentenced McHenry to life imprisonment on aiding and abetting first degree murder and

to a concurrent sentence of 6²/₃ to 20 years on aiding and abetting attempted robbery. McHenry now appeals.

McHenry, Frank Ladig, Antonio Estrada, Nordell Moore, and others were living in an encampment near the American Legion Club in North Platte, Nebraska. As Sterkel was walking his bike by the campsite, McHenry invited him to join the group in some drinking.

During the time that Sterkel stayed with the group, the men drank heavily. After the group went swimming in the South Platte River, Sterkel noticed that his wallet was missing, and he announced this to the group. Ladig testified that he found the wallet in his shoes, returned it to Sterkel, and asked Sterkel to check to determine if the money was still there. Sterkel confirmed that the $52 was still in his wallet. Shortly thereafter, McHenry and Ladig argued about Sterkel's money. Ladig testified that McHenry told Ladig and Estrada that Sterkel's money was McHenry's and that they were to leave it alone. Estrada testified that Ladig later told him that he and McHenry had planned to rob Sterkel.

On July 28, 1992, it was raining and the group relocated underneath a nearby bridge. McHenry, Ladig, Sterkel, Moore, and Estrada were present. Ladig testified that McHenry suddenly stood up and announced, " 'Let's do it.' " McHenry looked at Estrada and asked him if he was ready, and Estrada also stood up. McHenry then hit Sterkel in the face with his fists. Estrada asked Ladig if he was going to join them in their actions against Sterkel, and Ladig agreed. Ladig and Estrada hit Sterkel a few times.

McHenry asked Sterkel for his wallet, and Sterkel told him that the wallet was hidden in the trees. McHenry ordered Sterkel to take him to it, and the group began prodding Sterkel along a path through the woods, hitting and kicking him.

Ladig testified that when Sterkel fell down, Estrada jumped on Sterkel and began to choke him. Ladig picked Sterkel up and forced him along the path. Sterkel fell a second time, and McHenry kicked Sterkel in the face and upper body. McHenry demanded, " 'Where's your wallet,' " and Sterkel replied that it was in the trees. Unable to find the wallet, McHenry returned and again began to kick and strike Sterkel. Ladig tes-

tified that during this time, he heard a sound "like [Sterkel] was choking on his blood or something."

Estrada testified that the kicking and beating continued until they arrived at the place where Sterkel had said his wallet and money were located. Still unable to find the wallet, McHenry and Ladig began to violently beat Sterkel. McHenry held Sterkel while Ladig pulled his clothes off and searched the clothes for the wallet. Not finding the wallet, Ladig and McHenry again beat Sterkel and burned him with cigarettes. Estrada testified that McHenry orally sodomized Sterkel and that Ladig stated he was going to anally sodomize Sterkel. Estrada then left and was joined 45 minutes later by Ladig. Estrada testified that when he returned to Sterkel's naked body, he could hear Sterkel "gurgling." Estrada placed a sheet over Sterkel's body and left.

Sterkel's body was discovered on July 30, 1992, near the North Platte American Legion Club. An autopsy indicated that the cause of death was manual strangulation, compression of the neck, and multiple blunt injuries to the head, neck, and chest.

## ASSIGNMENTS OF ERROR

McHenry assigns the following errors: The district court erred in (1) giving jury instructions Nos. 3 and 4, (2) not permitting venirepersons to be sequestered or individually questioned regarding pretrial publicity on voir dire, (3) finding Ladig unavailable to testify and allowing his prior testimony to be read to the jury, (4) failing to properly instruct the jury on reasonable doubt, and (5) refusing to grant McHenry's motions for change of venue.

## ANALYSIS

### Felony Murder Jury Instructions

McHenry's first assigned error is that instructions Nos. 3 and 4 were erroneous. McHenry apparently intends to assign error to the use of jury instructions Nos. 2 and 3, not 3 and 4. Instructions Nos. 2 and 3 are instructions regarding felony murder and were the subject of objections at the instruction conference. To the extent that there is some separate objection

to instruction No. 4, it has not been preserved at trial for appeal, and it is not discussed as error in the brief.

Instructions Nos. 2 and 3 set out the felony murder theory. The pertinent portion of instruction No. 2 is as follows: "This is a criminal case in which the State of Nebraska has charged the defendant in Count I with, on or about July 28, 1992, knowingly or intentionally aiding another to attempt to perpetrate a robbery or commit a first degree sexual assault in which Richard Sterkel was killed." The relevant portion of instruction No. 3 reads:

> In order for the defendant to be found guilty of Count I, the State must prove the elements of felony murder beyond a reasonable doubt. The State must prove that:
>
> 1. The defendant aided another person, that is he hired, encouraged or helped another person in the attempted commission of a robbery, or in the commission of a first degree sexual assault;
>
> 2. That he did so knowingly or intentionally;
>
> 3. That he did so knowing that the other person intended to commit a robbery or that the other person intended to commit a first degree sexual assault;
>
> 4. That the robbery was attempted to be committed or the first degree sexual assault was actually committed;
>
> 5. That during the course of the attempted commission of the robbery or during the course of the commission of the first degree sexual assault the death of Richard Sterkel resulted.

At the instruction conference, McHenry's counsel objected to these instructions and also objected to the general use of aiding and abetting sexual assault as one of the underlying felonies which would provide the basis for a conviction for felony murder. As McHenry's counsel correctly pointed out, McHenry had previously been acquitted of aiding and abetting first degree sexual assault. McHenry's counsel argued that to submit such an instruction would permit the jury to pass on McHenry's guilt or innocence for aiding and abetting first degree sexual assault a second time and would therefore subject McHenry to jeopardy twice for the same crime. In spite of this proper objection, the district court overruled the objec-

tion to the instruction without explanation. McHenry raises this same argument on appeal.

The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution prevents a second prosecution for the same offense after acquittal. See *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996). McHenry was acquitted of aiding and abetting sexual assault in the first trial. The question is whether this acquittal of a felony in a previous trial prevents the use of the same felony as an underlying felony to support a felony murder prosecution in a retrial. Although this is a case of first impression in Nebraska, the principles underlying the double jeopardy protection clearly establish that acquittal of a felony in a previous trial prevents the use of the same felony as an underlying felony to support a felony murder prosecution in a retrial.

A similar double jeopardy issue was addressed by the U.S. Supreme Court in *Sanabria v. United States*, 437 U.S. 54, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978). The defendant, along with several codefendants, was originally charged with operating a gambling business, which was a crime under 18 U.S.C. § 1955 (1976). One of the elements of this crime required that the prosecution prove that the defendant violated a state gambling statute. The prosecution presented evidence that the defendant was operating a "numbers gambling operation" and also put on evidence that the defendant was operating a betting operation on horse races. Only the horse racing betting operation was illegal under the particular Massachusetts statute the prosecution alleged the defendant had violated. At the end of the government's case in chief, defense counsel argued that the government had failed to prove the required element that the defendant violated a state gambling statute. The defendant pointed out that the statute the prosecutors used to meet this element did not prohibit numbers betting, but only horse betting. After the defendant rested, the trial judge granted the defendant's motion to exclude all evidence of numbers betting and then granted a motion to acquit the defendant of the federal gambling charge because of lack of evidence of the defendant's connection with the horse gambling aspect of the business.

The government appealed from the order which excluded the numbers-betting evidence and from the judgment acquitting the defendant, and sought a new trial on the portion of the indictment relating to the numbers betting. The U.S. Court of Appeals for the First Circuit agreed that the numbers-betting aspect of the charge could not be retried, but nevertheless vacated the acquittal as it applied to the numbers-betting theory.

On appeal, the U.S. Supreme Court reversed the vacation of the acquittal, noting that the acquittal on the horse-betting charge included a specific acquittal on the element that was necessary to prove the gambling operation charge under the numbers-betting theory. The Court emphasized that this acquittal was a controlling finding of fact on that particular element and that a retrial on a different charge which required proof of that element was prohibited by the double jeopardy bar. "[A] subsequent trial of petitioner for conducting the same illegal gambling business as that at issue in the first trial would subject him to a second trial on the 'same offense' of which he was acquitted." *Sanabria*, 437 U.S. at 74.

*Sanabria* has been applied in a case very similar to the case at bar. The defendant in *Wright v. State*, 307 Md. 552, 515 A.2d 1157 (1986), was originally charged and prosecuted for murder under two separate theories. He was charged with first degree murder under a first degree murder theory which required premeditation and deliberation and was also charged with murder under a felony murder theory with the underlying felony being attempted robbery. He was also charged in a separate count for the underlying attempted robbery. At the conclusion of the state's case, the court granted a motion for judgment of acquittal as to the attempted robbery on the grounds of insufficient evidence to support the conviction. The trial court denied the motion to acquit the defendant of first degree murder because it found that there was sufficient evidence to support the first degree murder charge, which was not based on the felony murder theory.

During the defendant's portion of the case, a codefendant presented evidence which bolstered the defendant's involvement in the attempted robbery. In view of this additional evi-

dence, the court permitted the murder charge to be submitted to the jury on a felony murder theory at the end of the defendant's case. The court stated that while double jeopardy principles prevented the court from reinstating the underlying felony charge of attempted robbery, the court was not barred from permitting the jury to consider the defendant's guilt regarding the underlying felony for the sole purpose of determining whether there was sufficient proof of an underlying felony to support the felony murder charge. The jury subsequently found the defendant guilty of felony murder.

On appeal, the Maryland Court of Appeals applied *Sanabria* and double jeopardy principles and reversed the defendant's conviction. The court held that the prior acquittal on the underlying felony was an absolute bar to the jury's subsequent consideration of the same underlying felony as a basis to support the felony murder theory. The court stated:

> [A]fter the prosecution's case, there was a judicial determination that the prosecution had failed to present sufficient evidence of an attempted robbery by the defendant Wright, and a verdict of acquittal with regard to the matter was entered. The defendant Wright was then required to run the gauntlet further on the question of whether he committed the attempted robbery, and he was subjected to a second resolution of the matter. There were two verdicts on the issue of whether he committed the attempted armed robbery, the first being the acquittal by the trial judge and the second being the conviction of felony murder by the jury.

*Wright*, 307 Md. at 574, 515 A.2d at 1168.

We find the analysis in *Wright* instructive for the issues before us. McHenry was originally charged with aiding and abetting first degree sexual assault. He was prosecuted on that charge and defended against it. A jury acquitted him. As a result, it was error for the district court to include a reference to this count as one of the possible underlying felonies supporting a felony murder conviction and thereby force McHenry to face determination of his guilt on that charge again. Thus, the use of instructions Nos. 2 and 3 was error.

This, however, does not end our inquiry. We must consider whether use of the erroneous instructions constituted reversible error or merely harmless error. Even a constitutional error which was harmless beyond a reasonable doubt does not warrant the reversal of a criminal conviction. *State v. White*, 249 Neb. 381, 543 N.W.2d 725 (1996). In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *Id.*

Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely attributable to the error. *Id.*

From our review of these instructions, we find that the use of instructions Nos. 2 and 3 was harmless. These instructions presented the jury with two possible underlying felonies upon which to base its verdict of felony murder: (1) aiding and abetting attempted robbery and (2) aiding and abetting sexual assault. As previously stated, the inclusion of the latter was clearly erroneous. However, in an independent finding regarding count II, the jury convicted McHenry of aiding and abetting attempted robbery. Therefore, the jury found McHenry guilty of an underlying felony for which he was properly tried and the jury was properly instructed. That underlying felony provides a sufficient basis for the felony murder conviction. It also establishes that the jury verdict of felony murder was based upon the conviction for aiding and abetting robbery. Thus, the felony murder verdict rendered following McHenry's trial was not attributable to the erroneous instructions. See *White, supra.* Therefore, we find beyond a reasonable doubt that the erroneous instructions were harmless.

## QUESTIONING OF JURY PANEL

McHenry next argues that the district court erred in failing to sequester the potential jurors and to permit McHenry's counsel to individually question each potential juror regarding

pretrial publicity. The court refused to sequester the panel or permit the individual sequestered questioning, but permitted questions regarding pretrial publicity to be made to the panel as a whole. The court stated that if during voir dire it became apparent that such sequestration and individual questioning would be necessary to determine whether the potential jurors would be impartial, the court would then permit the jurors to be sequestered and permit individual questioning. McHenry alleges that the court should have permitted sequestration of the potential jurors for individual questioning and that because it did not, he was unable to determine the impact of pretrial publicity on each potential juror and therefore was denied his right to trial by an impartial jury.

The district court explained that if one of the potential jurors raised the issue of retrial, the court would intervene and explain to the panel that the fact that the current trial was a retrial was of no significance and that they as jurors would be required to ignore that fact and judge the case anew on the evidence presented. During the initial discussion of jury service, the court emphasized to the panel the nature of a jury trial and the duty of jurors to judge the evidence impartially. The court asked the members of the panel to speak out if any of them were concerned that they could not put aside pretrial publicity and determine the case solely on the evidence presented. There was no response from the panel, and after engaging in a few more questions, the court turned the voir dire over to counsel.

Subsequently, one of the potential jurors announced that he was not sure he could approach the case impartially in view of the fact that this was a retrial. The court interrupted the potential juror and addressed the panel as a whole. The court clarified that the issue on voir dire was not whether the potential jurors were aware of pretrial publicity regarding the alleged crime or the fact that the trial was a retrial, but whether the panel could put whatever knowledge they had regarding the case aside and judge the case impartially, considering only the evidence admitted at trial. After this admonition, the court permitted McHenry's counsel to further question the potential juror who had raised the issue of retrial. The potential juror

affirmed that he would be able to judge the case based only on the evidence presented at trial.

McHenry's counsel asked the members of the panel to raise their hands if any of them had heard any pretrial publicity about the case. Many of the jurors raised their hands. McHenry's counsel then questioned one of the jurors individually, surveying what publicity she had seen regarding the trial and whether she could be impartial. She indicated that she would try to be impartial but was not sure if she would be able to. She indicated that the fact that the case was a retrial would always be in the back of her mind. McHenry's counsel then requested sequestration of the jurors who indicated that they had had contact with pretrial publicity. Counsel stated that he could not further question the potential jurors without addressing specific news items. Counsel pointed out that unless he was able to question each potential juror individually, and sequestered from the venire, he would necessarily expose the other potential jurors to the same news items.

The court refused to sequester the panel and permit individual questioning, but indicated that it would permit counsel to go through the panel one by one with nonspecific questions about their contact with pretrial publicity surrounding the case. If any potential juror indicated that he or she had been exposed to pretrial information regarding the case, and it was apparent that the juror needed to be questioned privately, the court would permit private questioning. Barring such an incident, however, the court would not presume that individual sequestered voir dire was necessary.

The court then resumed voir dire with a lengthy admonition to the panel regarding impartiality and the importance of considering whether they could be impartial. The court reiterated that the potential jurors had to attempt to assess whether they could put aside any publicity that they may have heard and be willing to judge the case solely on the evidence presented. The court then asked the panel as a whole the following question: "Are there any of you who cannot put aside any information that you may have and decide the case on the evidence that comes into this court and this trial today? If so, please raise your hand." The record reflects that several hands were raised,

and thereafter, the court excused each person who raised his or her hand. The court then questioned the replacement jurors on the same matters.

Prior to the end of voir dire, McHenry's counsel again requested that he be able to question the potential jurors individually regarding the effect of pretrial publicity on their ability to consider the case impartially. Counsel admitted to the court that he could not specifically articulate how the individual questioning would aid the court in determining whether a potential juror should be excused. As before, the court stated that it would permit McHenry's counsel to ask the entire panel about specific news reports and then pursue further questioning about their ability to be impartial. However, the court refused to sequester the potential jurors so the questions could be answered individually. The court emphasized that the panel had been asked about whether they had been exposed to pretrial publicity and whether they could put this aside and judge the case based solely on the evidence. The members of the panel that remained had all indicated that they could be impartial. Thus, the court reasoned that sequestered individual questioning of the panel was not necessary to determine whether the members could be impartial.

The court also stated that it would instruct the potential jurors that if they had any specific concerns, they could contact the bailiff during the lunch break to express them. Subsequently, one member of the panel contacted the court after the lunch break regarding pretrial publicity, and that potential juror was questioned privately with both parties' counsel present. During questioning, the juror informed the court that she felt she had formed an opinion and did not believe that she could be impartial. She was excused for cause. Once the panel reconvened, the court again explained the irrelevance of the fact that the case was a retrial and once again asked the potential jurors whether any of them had concerns about whether they could be impartial. None of the members responded, and the parties were then requested to make their peremptory challenges.

Except when there is a showing that without sequestration a party's rights would be prejudiced, a party has no right to

examine a potential juror out of the presence of all the other potential jurors. *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993). McHenry's only colorable argument that sequestration and individual questioning were required to prevent prejudice to his trial is that McHenry would not be able to question each potential juror about pretrial publicity without thereby exposing the other potential jurors to the publicity. The same argument was raised by counsel in *State v. McHenry, supra*, in which we discussed *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990). In *Bradley*, the defendant argued that he was unable to ask "searching questions" required under the circumstances. However, the record in *Bradley* was replete with questioning regarding pretrial publicity and whether such publicity had caused anyone to form an opinion as to Bradley's guilt or innocence. We held that the district court's failure to sequester the jury panel did not unfairly prejudice the defendant. See, also, *State v. Thompson, supra*.

In the case at bar, we find that the circumstances of the voir dire do not demonstrate how McHenry was prejudiced. The prospective jurors were admonished by the court on numerous occasions concerning pretrial publicity and the irrelevance of the fact that the case was a retrial. The panel was questioned several times as to whether any of the members thought that they could determine McHenry's guilt based solely on the evidence presented at trial. The judge specifically instructed the panel that if any panel member had further concerns, he or she should contact the bailiff so that the court, along with the parties, could individually hear and address the concerns. In each case, when a panel member stated that he or she could not put aside pretrial publicity, the member was dismissed for cause. As in *Bradley*, McHenry has not shown how further indepth questioning of sequestered jurors would have revealed anything more than was ascertained during the jury selection. Therefore, McHenry has not established that his rights were prejudiced by the failure of the district court to sequester the panel to permit individual questioning.

DETERMINATION THAT LADIG WAS UNAVAILABLE TO TESTIFY

At trial, the State attempted to call Ladig as a witness against McHenry. Ladig refused to testify, and the district court declared him unavailable. As a result, the court permitted Ladig's testimony at McHenry's first trial to be read into evidence. McHenry argues that the district court erred in determining that Ladig was unavailable and in permitting his prior testimony to be admitted against McHenry.

Ordinarily, the testimony of a person taken in a prior trial is hearsay and is not admissible. See Neb. Rev. Stat. §§ 27-801 and 27-802 (Reissue 1995). However, Neb. Rev. Stat. § 27-804(2)(a) (Reissue 1995) provides an exception to the hearsay rule if the declarant is unavailable as a witness. In such a case, the prior testimony can be used in the trial. Section 27-804(2) provides:

> Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (a) Testimony given as a witness at another hearing of the same or a different proceeding . . . at the instance of or against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered . . . .

McHenry argues that a determination of unavailability based on § 27-804(1)(b) requires the court to first "order" the witness to testify prior to exercising its determination that the witness is unavailable.

The determination of whether a witness is unavailable is left to the discretion of the trial court. See *State v. Bothwell*, 218 Neb. 395, 355 N.W.2d 506 (1984). A judicial abuse of discretion exists when the reasons or rulings of a trial court are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in matters submitted for disposition. *State v. Parmar*, 249 Neb. 462, 544 N.W.2d 102 (1996); *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

We conclude from the record that the court did not abuse its discretion in concluding that Ladig was unavailable as a

witness despite the fact that the court did not directly order Ladig to testify. The court requested Ladig to testify on three separate occasions. Nevertheless, Ladig persistently refused. The court noted that the normal contempt remedies available to force Ladig to testify were meaningless in view of the fact that Ladig was already serving a lengthy sentence. The court asked Ladig if there was any physical safeguard or anything that the court could provide that would make him change his mind and provide testimony. Ladig replied that there was not. The court then reasoned that because Ladig had expressed his unwillingness to take the oath and testify, and as there was no sanction available that would compel Ladig's testimony, Ladig was unavailable. The jury was then called into the courtroom, and Ladig was called as a witness. The court again asked Ladig to raise his hand and be sworn, and he refused. The court then permitted Ladig's testimony from the prior trial to be read into evidence, and the jury was instructed that it should be given the same weight as if it were given by a live witness.

It is clear from the record that Ladig was intent on refusing to testify. The fact that the trial court's instruction to testify was not couched in the specific language of an "order" has little bearing on the reality of Ladig's refusal which is evident on the face of the record. The trial court's determination that Ladig was unavailable as a witness is not untenable, and therefore, no judicial abuse of discretion occurred.

## REASONABLE DOUBT JURY INSTRUCTION

McHenry argues that the district court erred by giving instruction No. 6 defining reasonable doubt. The instruction provided:

> The defendant is presumed to be innocent of the charges contained in the information. This presumption remains with the defendant throughout the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty.

> The fact that the State of Nebraska has charged the defendant in an information is not evidence, and the State has the burden of proving the guilt of the defendant

beyond a reasonable doubt. This burden remains on the State throughout the trial. The defendant is not required to prove his innocence. The State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt formed upon reason. It is not a fanciful doubt, a whimsical doubt or a capricious doubt. Proof beyond a reasonable doubt requires proof so compelling as to convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. However, if you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty.

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Ryan*, 249 Neb. 218, 543 N.W.2d 128 (1996); *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996). In *Victor v. Nebraska*, 511 U.S. 1, 6, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994), the U.S. Supreme Court explained that the standard for assessing the constitutionality of a reasonable doubt instruction is as follows:

[T]he proper inquiry is not whether the instruction "could have" been applied in [an] unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it. [Citation omitted.] The constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard.

McHenry concedes that we have already validated this reasonable doubt instruction in *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995). Nevertheless, McHenry asks us to reconsider our holding in *State v. McHenry, supra,* which stated that the language quoted above was a permissible instruction on the definition of reasonable doubt. He argues that

the U.S. Supreme Court has approved a definition of reasonable doubt which defines reasonable doubt by using a "hesitation to act" standard. McHenry argues that the instruction used by the district court did not utilize the "hesitation to act" standard and that, therefore, the district court's instruction was reduced to a statement that a reasonable doubt is the opposite of fanciful, whimsical, or capricious doubts. McHenry points out that there are doubts which are fanciful, whimsical, or capricious, but still not reasonable. Thus, he argues, the use of this instruction did not properly define reasonable doubt and therefore violated his right to due process.

We find this assignment of error to be without merit. Here, the instruction did not use the exact words "hesitation to act." Instruction No. 6 as given substituted the term "reservation" for "hesitation." However, the U.S. Supreme Court stated in *Victor* that the Constitution does not require that any particular form of words be used in advising the jury of the State's burden of proof. The only issue is whether there is a reasonable likelihood that the jury understood the instruction to allow conviction based on proof to meet the reasonable doubt burden of proof set forth in *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The "hesitation to act" language cited by McHenry is significant only because the U.S. Supreme Court has repeatedly validated it as one proper method of defining reasonable doubt. The U.S. Supreme Court has never held that this language must be used to satisfy *Winship*.

We reaffirm our holding that the use of this instruction was not error. See *State v. McHenry, supra*.

VENUE

McHenry next argues that the district court erred in failing to grant his pretrial motions for a change of venue. A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *Id.*; *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993). A trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a

fair trial. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

McHenry moved for a change of venue prior to trial, pursuant to Neb. Rev. Stat. § 29-1301 (Reissue 1995), which states:

> All criminal cases shall be tried in the county where the offense was committed, except as otherwise provided in section 25-412.03 or sections 29-1301.01 to 29-1301.03, or unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein. In such case the court, upon motion of the defendant, shall transfer the proceeding to any other district or county in the state as determined by the court.

In *State v. McHenry, supra*, we reviewed the law regarding motions for change of venue due to pretrial publicity. We reviewed the factors a trial judge is to use to determine whether pretrial publicity in fact makes it impossible for a fair trial to be had at the present location of the trial.

> " '[M]ere jury exposure to news accounts of a crime does not presumptively deprive a criminal defendant of due process. Rather, to warrant a change of venue, a defendant must show the "existence of pervasive misleading pretrial publicity." [Citation omitted.] Indeed, in order for a defendant to successfully move for a change of venue based on pretrial publicity, he or she must show that the "publicity has made it impossible to secure a fair and impartial jury." [Citations omitted.] A number of factors must be evaluated in determining whether that burden has been met, including the nature of the publicity, the degree to which the publicity has circulated throughout the community, the degree to which the publicity circulated in areas to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in the selection of the jury, the number of challenges exercised during the voir dire, the severity of the offenses charged, and the size of the area from which the venire was drawn. [Citations omitted.]

" ' . . . ' "

"[T]he law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based on evidence presented in court." [Citation omitted.]

*State v. McHenry*, 247 Neb. 167, 172-73, 525 N.W.2d 620, 625-26 (1995).

McHenry argues that the publicity which preceded his second trial made it impossible for him to receive a fair trial in Lincoln County. In particular, McHenry emphasizes that the pretrial publicity before the retrial was "inherently prejudicial," because it emphasized the fact that the second trial was a retrial and that McHenry had been convicted of several counts in the first trial.

The district court held a pretrial hearing on the motion for change of venue. At the hearing, McHenry presented a number of news accounts which appeared in Lincoln County news media regarding allegations against McHenry. Included were several items that were issued after this court reversed McHenry's convictions. We have reviewed the news items about the reversal of McHenry's original convictions and the retrial. There are a total of 10 newspaper articles which ran in the North Platte Telegraph following the reversal. There is also one video segment from a North Platte television station from this time period. The newspaper accounts generally include a short synopsis of the allegations against McHenry, a reference to McHenry's prior convictions, and an explanation of why this court reversed the convictions.

The most emotionally motivated articles are editorials criticizing this court for the reversal of McHenry's convictions and addressing the financial costs of retrial. Most of these accounts do not focus at length on the allegations against McHenry. The one television report which ran after the reversal includes the prosecutor's statement that he was "physically even upset" and "surprised and shocked" with the reversal, and his explanation of why he believed this court had ruled incorrectly.

Pretrial publicity regarding a retrial after a conviction may in some cases present more difficult venue issues than those of an initial trial, but a determination of whether a change in venue is necessary remains within the discretion of the trial court. The standard for establishing a change of venue remains the same:

> " '[T]o warrant a change of venue, a defendant must show the "existence of pervasive misleading pretrial publicity." [Citation omitted.] Indeed, in order for a defendant to successfully move for a change of venue based on pretrial publicity, he or she must show that the "publicity has made it impossible to secure a fair and impartial jury." [Citations omitted.]' "

*McHenry*, 247 Neb. at 172-73, 525 N.W.2d at 625.

The news accounts referenced above do not establish the existence of misleading pretrial publicity, let alone pervasively misleading publicity. McHenry has not shown that the publicity made it impossible to secure a fair and impartial jury. This assignment of error has no merit.

SENTENCING FOR FELONY MURDER AND UNDERLYING FELONY

Although not complained of at trial or on appeal, a double jeopardy problem remains. McHenry was sentenced for both felony murder and aiding and abetting attempted robbery. Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Perrine v. State*, 249 Neb. 518, 544 N.W.2d 364 (1996).

The Double Jeopardy Clause precludes multiple punishment for the same offense imposed in a single proceeding. *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). The multiple punishment prong of the double jeopardy bar seeks to ensure that "the total punishment did not exceed that authorized by the legislature." See *United States v. Halper*,

490 U.S. 435, 450, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989). See, also, *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

A determination of whether two convictions in a single trial lead to multiple punishment depends upon whether the legislature that designated the criminal statutory scheme intended that cumulative sentences be applied for conviction on both offenses. If the statute clearly and affirmatively indicates that the legislature intended that the defendant be punished cumulatively under both charges and the sentences for both charges are imposed in a single trial, the Double Jeopardy Clause is not offended. See *State v. Detweiler, supra*. A conviction of felony murder and the underlying felony in the same proceeding is a species of impermissible multiple punishment if the legislature did not designate that multiple sentences should be applied for conviction on both offenses. See *Jones v. Thomas*, 491 U.S. 376, 109 S. Ct. 2522, 105 L. Ed. 2d 322 (1989).

In the case at bar, there is no affirmative indication in either the felony murder statute or the robbery statute that the Legislature intended that a defendant should be punished independently for both felony murder and the underlying felony on which it relies. See Neb. Rev. Stat. §§ 28-303, 28-324, and 28-206 (Reissue 1995). As a result, McHenry's conviction and sentence for both felony murder and the underlying felony violates the Double Jeopardy Clause's proscription against multiple punishments for the same offense. The underlying felony merges into a felony murder conviction and cannot be punished separately, barring a clear indication by the Legislature that independent punishments were intended.

The U.S. Supreme Court has held that vacating the sentence for an underlying felony cures the double jeopardy violation at hand. See *Jones v. Thomas, supra*. As a result, we vacate the sentence for the underlying felony.

## CONCLUSION

The district court's judgment of conviction of McHenry for first degree murder and for aiding and abetting attempted robbery is affirmed. The district court's sentence for first degree

bery is affirmed. The district court's sentence for first degree murder is affirmed. The district court's sentence for aiding and abetting attempted robbery is vacated.

AFFIRMED IN PART, AND IN PART
SENTENCE VACATED.