STATE OF NEBRASKA, APPELLEE, V.
DARRELL LEE MCBRIDE, APPELLANT.
567 N.W.2d 136

Filed July 25, 1997.    No. S-96-815.

James E. Mitchell for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

The defendant-appellant, Darrell Lee McBride, was charged in the first case, at the district court's docket 9672, page 149, with attempted first degree assault, a Class IV felony, in violation of Neb. Rev. Stat. §§ 28-201 and 28-308 (Reissue 1995); with discharge of a firearm, a Class III felony, in violation of Neb. Rev. Stat. § 28-1212.02 (Reissue 1995); and with use of a firearm to commit a felony, a Class II felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1995). In the second case, at the district court's docket 9672, page 285, McBride was charged with being a felon in possession of a firearm, a Class III felony, in violation of Neb. Rev. Stat. § 28-1206 (Reissue 1995). After the cases were consolidated for trial, McBride waived a jury in the second case, which was tried to the bench at the same time as the first case was tried to a jury.

In accordance with the verdict in the first case, the district court adjudged McBride guilty on each of the three offenses charged in that case and further adjudged him guilty of the

offense charged in the second case. The district court thereafter sentenced McBride in the first case to imprisonment for a single period of not less than 20 months nor more than 5 years on both the attempted assault and discharge crimes combined, and to a consecutive like period of imprisonment on the use crime. In the second case, the district court sentenced McBride to imprisonment for a period of not less than 2 nor more than 10 years, to be served consecutively to the sentences imposed in the first case.

McBride appealed to the Nebraska Court of Appeals, asserting, in summary, that the district court erred in (1) improperly arraigning him, (2) imposing improper sentences, (3) permitting him to be placed in multiple jeopardy, (4) finding the evidence sufficient to support the charges, and (5) failing to ensure that he received the effective assistance of counsel. He thereafter successfully petitioned to bypass the Court of Appeals.

For the reasons hereinafter stated, the judgment in the first case is affirmed in part and in part vacated and set aside and the cause remanded with direction; the judgment in the second case is affirmed.

## II. FACTS

### 1. EVENTS

At approximately 10:15 p.m. on January 13, 1996, Brandon Griswold, Richard Rodrigo, and another man drove to the residence of John Labs, which was located in the area of West 23d and Calhoun Streets in Bellevue, Sarpy County, Nebraska, to attend a "little get-together" Labs was having. Griswold testified that after about 15 minutes to half an hour, he, Rodrigo, and two others, Luis Victoria and Jean-Paul "JP" Reavill, who were also at Labs' residence, went outside, preparing to leave. Rodrigo testified that he believed they remained at the house "probably an hour or two."

In any event, according to Griswold, as the four men approached Griswold's automobile, McBride appeared and said, "what's up . . . you want some of this . . . ." Griswold and the three other men entered Griswold's automobile, with Griswold taking the driver's seat, Rodrigo the front passenger seat, Victoria the passenger-side back seat, and Reavill the

driver's-side back seat. As Griswold backed the automobile onto the street from a driveway, Rodrigo opened the passenger-side window and asked McBride what the problem was. Griswold claims that as he turned the corner, reaching a speed of between 35 and 45 miles per hour, he saw through his rearview mirror that McBride and another man wearing a white T-shirt were "chasing after" them. He also saw through his rearview mirror that McBride had pulled out a gun. Griswold then ducked, slammed on the accelerator, and heard four or five quick gunshots. He did not actually see McBride fire the weapon and was not focused on the other man with McBride.

At this same time, Rodrigo had his head outside the vehicle's window to see what was happening. He testified that he saw McBride run directly behind the automobile, pull out a gun from behind his leg, point it in the automobile's direction, and fire it. He heard four shots and pulled his head back into the vehicle once he saw that McBride was firing.

Contrary to the testimony of those two witnesses, Reavill testified that he did not see McBride at any time before he got into Griswold's automobile. He further testified that while he was seated in the vehicle, he could not "really see out of it" because it was dark outside and the windows were tinted. He stated, "I couldn't really picture faces and everything, but I saw like a whitish shirt and flashing right next to it, but I don't know who did it or — I didn't really think nothing of it because it didn't sound real." Reavill testified that he did not see McBride with a gun at any time that evening.

After the shooting, the four men proceeded to a nearby gas station where, while inspecting the automobile for damage, Griswold discovered what he believed to be two bullet holes in the passenger-side mirror. In actuality, the plastic encasement around the right outside rearview mirror contained two areas of damage. One of the broken areas was approximately three-eighths of an inch in width and one-fourth of an inch deep. The other area was approximately three-fourths of an inch in width and one-fourth of an inch deep. The two damaged areas were $2\frac{1}{8}$ inches apart.

Although the gas station was open for business, none of the men asked to use the telephone. Griswold, Reavill, and Rodrigo

also saw a police officer at a nearby parking lot, but none of them flagged him down. Instead, according to Griswold, he and Rodrigo reentered Griswold's automobile and returned to Labs' residence. Reavill, however, testified that all four of the men and two other men driving another vehicle returned to Labs' residence.

Griswold claimed that once at Labs' residence, McBride again approached them, but that this time he did not have a gun. Griswold and Rodrigo testified that McBride said he had mistaken the four men for some other people and that he would pay for the damage to Griswold's automobile. An argument subsequently developed between Rodrigo and McBride, which escalated to the point that McBride punched Rodrigo in the chest. After a number of other people entered the fight, Griswold drove to the police station to report the incident.

McBride and his friend, Michael Surrett, testified to a very different version. According to them, on the night in question Labs, a neighbor of the Surretts, contacted Surrett's wife, who, in turn, contacted Surrett and McBride at a drinking establishment. Labs asked that Surrett and McBride come to Labs' house because some people he had had in the house earlier were tearing it up. Surrett claimed that he and McBride arrived at the Surretts' house between 11 and 11:30 p.m.

McBride testified that after he helped Surrett's wife carry groceries into her house, he went to Labs' house to see if everything was under control and to get a can of beer. At the same time, Rodrigo hung his head out of an automobile window and loudly said something, causing McBride to ask Rodrigo what he was saying. McBride claims he then asked Labs what was going on, to which Labs replied that the situation was "okay" because the people in the automobile were leaving. As McBride turned to start walking back toward the Surretts' house, he heard noises which could be described as gunfire and then ran to the Surretts' house. He further claimed he did not have a gun in his possession and did not see any of the gunfire.

Five minutes later, McBride went outside the Surretts' house to smoke a cigarette. While doing so, Griswold and the other men drove up, got out of the automobile, and started walking toward McBride. McBride stated that the fight in the street

began after Rodrigo approached McBride and asked him what he had said and whether somebody had shot at them, to which McBride replied that it was not his, McBride's, business and that Rodrigo should "get out of [his, McBride's,] face." McBride claims he never had a conversation with Rodrigo or Griswold to the effect that he, McBride, was sorry, that he thought the men were somebody else, or that he would pay for any damages to the automobile's mirror.

Police were dispatched in response to the physical disturbance. During their investigation, they discovered six .25-caliber spent shell casings in the roadway along Calhoun Street. Because so many people were milling around the area, one officer "stuck" four of the casings in his pocket. The other two casings were protected by a traffic cone. The officers also located a .25-caliber firearm in the crook of a tree behind a residence in the area. McBride was arrested that same evening in a residence adjacent to the area.

Once at the jail, McBride's hands were swabbed for a gunshot residue test, during which he volunteered that there had been a confrontation between him and some other individuals; that someone had fired a gun; and that although he had started picking up the empty shells that were lying on the street, he threw them back down after a friend so instructed. With regard to the continuing examination of the evidence found at the scene, four of the shell casings could not be tested for fingerprints because of the manner in which they were collected. No prints were found on the gun. The record establishes that McBride had previously been convicted of a felony.

### 2. ARRAIGNMENT

At the time McBride was arraigned in the first case, he was represented by Steven M. Delaney, assistant Sarpy County public defender. The district court informed McBride of the elements of the crimes charged and correctly advised him that the attempted assault was a Class IV felony carrying a maximum punishment of 5 years' imprisonment, a $10,000 fine, or both. However, the district court incorrectly apprised McBride that the discharge crime likewise was a Class IV felony and that the use crime was a Class III felony carrying a maximum punishment of 20 years' imprisonment, a $25,000 fine, or both, with a

minimum of 1 year's imprisonment. McBride thereafter pled not guilty to each of the crimes charged.

With Delaney again representing McBride, the district court subsequently arraigned McBride on the crime of "Discharging [sic] a Firearm by a Felon," advising him of the elements of the crime and correctly informing him that it was a Class III felony for which the punishment was a maximum of 20 years' imprisonment, a $25,000 fine, or both, with a minimum of 1 year's imprisonment.

Alternate Sarpy County public defender Julie E. Bear acted as McBride's defense counsel during the trials.

### 3. SENTENCING

Prior to sentencing, Bear was allowed to withdraw as counsel for McBride, and James E. Mitchell became McBride's counsel and represents him in this court. On the day of sentencing, the district court first dealt with a motion to set aside the convictions filed by McBride's most recent counsel. McBride's motion brought to the district court's attention for the first time that at the arraignment on the first case, the court had incorrectly stated the classifications of the discharge and use crimes charged and thus misstated their respective penalties.

The motion further recited that prior to the trials, the State had offered McBride a plea agreement by which the State offered to dismiss the use and possession crimes if McBride would agree to plead guilty to attempted assault and the discharge crimes. McBride had rejected the agreement, being advised by his then attorney that by exercising his right to a trial by jury, he exposed himself to no greater risk than a finding of guilt for two Class III and two Class IV felonies. McBride claimed in a supporting affidavit that had he been advised by anyone that he faced a possible conviction on a Class II felony, two Class III felonies, and a Class IV felony, he would have accepted the plea agreement to avoid the possible convictions. McBride's motion also asserted that the State had violated his right to be free from double jeopardy.

The district court denied McBride's motion and proceeded to sentence him.

## III. ANALYSIS

### 1. ARRAIGNMENT

In the first assignment of error, McBride asserts that since the district court did not properly advise him as to the penalties for each of the crimes with which he was charged, he was improperly arraigned and, as a consequence, could not and did not freely, intelligently, voluntarily, and understandingly elect to proceed to trial rather than accept the plea bargain offered by the State.

#### (a) Scope of Review

The issues raised by this assignment of error present questions of law, in connection with which an appellate court has an obligation to reach independent conclusions irrespective of the decision made by the court below. *State v. Thieszen, ante* p. 208, 560 N.W.2d 800 (1997). See, also, *In re Interest of Tabatha R., ante* p. 687, 564 N.W.2d 598 (1997).

#### (b) Application of Law to Facts

The district court apparently overlooked that the relevant statutes had recently been amended and that at the time the crimes were alleged to have been committed, § 28-1212.02 made the discharge crime a Class III felony and § 28-1205 made the use crime a Class II felony. The penalty for a Class III felony is a maximum of 20 years' imprisonment, a $25,000 fine, or both, with a minimum of 1 year's imprisonment. Neb. Rev. Stat. § 28-105 (Reissue 1995). The penalty for a Class II felony is 1 to 50 years' imprisonment. *Id.*

In support of his position that he was prejudiced by the wrong information he received, McBride directs our attention to *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986). The defendant therein had entered a plea of nolo contendere to second degree forgery, but argued on appeal that his acceptance of the plea bargain was not made intelligently or voluntarily because he had not been advised that the punishment for second degree forgery might run consecutively to a sentence he was already serving. In determining what must exist in order to support a finding that a plea of guilty or nolo contendere was entered freely, intelligently, voluntarily, and understandingly, we wrote:

1. The court must

a. inform the defendant concerning (1) the nature of the charge; (2) the right to assistance of counsel; (3) the right to confront witnesses against the defendant; (4) the right to a jury trial; and (5) the privilege against self-incrimination; and

b. examine the defendant to determine that he or she understands the foregoing.

2. Additionally, the record must establish that

a. there is a factual basis for the plea; and

b. the defendant knew the range of penalties for the crime with which he or she is charged.

*Id.* at 820, 394 N.W.2d at 883. See, also, *State v. Dodson*, 250 Neb. 584, 550 N.W.2d 347 (1996); *State v. Trackwell*, 250 Neb. 46, 547 N.W.2d 471 (1996).

Although we had previously written in *State v. Curnyn*, 202 Neb. 135, 140, 274 N.W.2d 157, 161 (1979), that it is "difficult to conceive how a guilty plea can be voluntary and intelligent unless and until the defendant is informed or is made aware of the possible penalties to which he may be subjected," we reasoned in *Irish* that this statement did not mean a trial court must explain whether each sentence imposed for each separate crime is to be served concurrently with or consecutively to any other sentence which may be imposed. We concluded by stating that "[e]xplaining the possible range of penalties for each crime is adequate to enable a defendant to freely, voluntarily, intelligently, and understandingly plead to each crime with which he is charged." *Irish*, 223 Neb. at 821, 394 N.W.2d at 883. In *Irish*, we thus rejected the defendant's claim that he should have been told of the effect of the possible imposition of consecutive sentences.

Moreover, it must be noted that the admonition in *Irish* that a defendant must be told the possible range of penalties for each crime was applied to a defendant who had accepted a plea agreement and pled guilty. Here, McBride could not have been prejudiced by pleading not guilty because by so pleading, he did not give up any of his constitutional rights. For example, the defendant in *Robtoy v. Kincheloe*, 871 F.2d 1478 (9th Cir. 1989), *cert. denied sub nom.*, *Robtoy v. Callahan*, 494 U.S.

1031, 110 S. Ct. 1483, 108 L. Ed. 2d 619 (1990), was charged with first degree aggravated murder, and the trial court entered a not guilty plea on his behalf when he stood mute at his arraignment. Following a jury trial, the defendant was convicted and sentenced to death. Because the statute under which he was sentenced to death was subsequently found to be unconstitutional, the sentence was modified to one of life without parole.

After his sentence was modified, the defendant became aware that he had the right to plead guilty, in which case the maximum sentence was life with parole. He made a motion in the trial court to withdraw his not guilty plea and enter a plea of guilty; however, the state supreme court held that the trial court had no jurisdiction to grant the motion. On appeal to the U.S. Court of Appeals for the Ninth Circuit, the defendant contended that the state court's refusal to allow him to alter his plea to guilty violated his right to due process because his right to make a voluntary and intelligent plea was denied when he was not informed at his arraignment that a plea of guilty would result in the lesser maximum sentence of life with parole versus the sentence of life without parole he risked by proceeding to trial.

The federal court concluded that the defendant's contention could not constitute the basis for a writ of habeas corpus, and wrote:

> Although [the defendant] may have been misinformed by his counsel and the court as to the consequences of a guilty plea, he did allow a plea of not guilty to be entered for him. Thus, he cannot argue he was coerced to give up the rights inherent in a trial.

871 F.2d at 1481-82.

Similarly, McBride has failed to point to the deprivation of any right when he elected to proceed to trial on his not guilty pleas and points to no authority for the notion that a defendant has the right to be offered a plea bargain. While he appears to urge that he was prejudiced because he put himself at risk for more severe penalties by proceeding to trial than he would have had he accepted the plea bargain, he fails to recognize that the district court tried him on the same crimes concerning which he had been advised; required the State to prove the identical elements about which he had been advised; and of the utmost sig-

nificance, sentenced him within the ranges of punishment he was originally informed were possible.

A somewhat similar situation was presented in *Hill v. Estelle*, 653 F.2d 202 (5th Cir. 1981), *cert. denied* 454 U.S. 1036, 102 S. Ct. 577, 70 L. Ed. 2d 481. The defendant therein was convicted on his plea of guilty for assault upon a peace officer with the intent to murder. He had committed the alleged act prior to the effective date of a new Texas Penal Code, but was tried and sentenced after the effective date of that code. Although the new code provided that a defendant might be sentenced under the new code for crimes committed before its effective date if the defendant so elected, the defendant was sentenced under the new code even though he did not so elect. Under the old code, the defendant's offense was punishable by imprisonment for life or for any term of years not less than 2. The new code provided for punishment by life imprisonment or for any term of years not more than 99 nor less than 5. The defendant was sentenced to imprisonment for not less than 5 nor more than 25 years.

On appeal to the U.S. Court of Appeals for the Fifth Circuit, the defendant claimed, inter alia, that the trial court had failed to properly admonish him on the range of punishment, in violation of state law regarding admonishments on guilty pleas. Relying on the familiar test that to rise to the level of a due process violation, the trial court's incorrect admonishment must somehow affect the knowing and voluntary character of the plea, the court of appeals concluded that even if a defendant is misinformed about the maximum possible sentence, the defendant's plea is not to be set aside as involuntary if he or she receives a sentence less than the law permitted or less than the defendant was informed that the court could impose.

In short, the considerations involved in determining whether one freely, intelligently, voluntarily, and understandingly pleads guilty have no application where a criminal defendant pleads not guilty, for in such a circumstance, the defendant does not surrender the constitutional rights inherent in a trial.

### (c) Resolution

Accordingly, McBride's argument regarding the risk he placed upon himself with regard to the possible greater punishments is without merit, and this assignment of error fails.

## 2. SENTENCING

In the second assignment of error, McBride claims that the district court wrongly treated for purposes of sentencing the attempted assault and discharge crimes as a single offense subject to a single sentence, notwithstanding the separate adjudication of guilt on each of the crimes.

### (a) Scope of Review

This assignment of error also raises issues which present questions of law and is reviewed accordingly.

### (b) Application of Law to Facts

### *(i) Attempted Assault and Discharge Crimes*

We begin by noting that although both parties treat the district court's action in this regard as an attempt to correct, by the sentences imposed, the misstatements of the court at arraignment, the record suggests instead that the district court combined the two offenses to correct a perceived double jeopardy problem. For while it is true the record reflects that at the sentencing the district court discussed the arraignment issues, the record also reveals that the district court then immediately turned its attention to the double jeopardy issues by stating:

> The Court considers [the attempted assault crime] and [the discharge crime] to be one [offense] for sentencing purposes. It is true the Nebraska Courts use the elements test to discern whether offenses are contained within another offense. The test is decided in State v. Parks at 245 Neb. 205. The elements of [the two crimes] certainly sound different, except for the date and venue, but the proof shows that the elements are one and the same if they had been spelled out in particulars.

It appears therefrom that the district court improvidently considered one of the two crimes to be a lesser-included offense of the other. However, we have held that to constitute a lesser-included offense, the elements of the lesser crime must be such that it is impossible to commit the greater crime without at the same time having committed the lesser one. *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993). In determining whether a lesser crime

is a lesser-included offense, we apply a statutory elements test, wherein a court initially looks not to the evidence but, rather, only to the elements of the criminal offense. See, *Null, supra*; *White, supra*.

In that regard, McBride asks that we revisit our holding in *State v. Woodfork*, 239 Neb. 720, 478 N.W.2d 248 (1991), setting forth the statutory elements test, and instead reconsider applying the "cognitive analysis approach," found in *State v. Harrington*, 236 Neb. 500, 461 N.W.2d 752 (1990) (disapproved by *Woodfork*), because the "five years of jurisprudence in Nebraska [after *Woodfork*] shows that the statutory elements analysis [approach] is no more judicially expedient than the cognitive analysis approach." Brief for appellant at 18. Contrary to McBride's characterization of *Woodfork*, however, to the extent it relied upon the cognate-evidence approach, *Woodfork* was also subsequently overruled on that basis. See *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). We decline McBride's invitation and adhere to the statutory elements test.

One commits an attempted first degree assault if one intentionally engages in conduct which is a substantial step in a course of conduct "intended or known to cause" "serious bodily injury to another person." §§ 28-201 and 28-308. One unlawfully discharges a firearm if one intentionally discharges it at, among other things, an occupied motor vehicle. § 28-1212.02. Thus, one offense is not a lesser-included offense of the other because one need not discharge a firearm to be proved guilty of attempted first degree assault and also because one need not intend or know that one's conduct will cause serious bodily injury to another to be proved to have discharged a firearm.

Accordingly, the district court had no legal basis upon which to impose a single sentence on the two adjudications of guilt. A sentence imposed without a legal basis is void. In the context of determining the effects of a prior sentence for enhancement purposes, we explained in *Berumen v. Casady*, 245 Neb. 936, 940, 515 N.W.2d 816, 819 (1994):

> For example, in *Mingus v. Fairbanks*, [211 Neb. 81, 317 N.W.2d 770 (1982)], we held that the trial court could not find the defendant guilty of the uncharged offense of

debauching a minor, notwithstanding defendant's plea of not guilty to pandering, as the former offense was not a lesser offense included with the pandering charge. In so ruling, we quoted with approval from *In re McVey*, 50 Neb. 481, 70 N.W. 51 (1897), which was cited with approval in *State v. McClarity*, 180 Neb. 246, 142 N.W.2d 152 (1966), as follows: "In *McVey*, the appellant was charged with the crime of burglary. The jury acquitted the appellant on the charge of burglary, but found him guilty of breaking and entering in the daytime. In discharging appellant from custody, we said at 483-84, 70 N.W. at 52: 'The only further question presented is whether the sentence of the court was merely erroneous or whether it was illegal in such a sense as to be void. It may be said that the modern doctrine or idea is that a court must possess jurisdiction not only of the person and subject-matter, but to impose the sentence which is adjudged. If the latter is lacking the sentence is not merely voidable but void. (Black, Judgments, sec. 258; citing, among others, *Ex parte Lange*, 18 Wall. [U.S.], [1]63[, 21 L. Ed. 872 (1874)]; *Ex parte Milligan*, 4 Wall. [U.S.], 131[, 18 L. Ed. 281 (1866)]; *Ex parte Wilson*, 114 U.S., 417[, 5 S. Ct. 935, 29 L. Ed. 89 (1885)]; *Ex parte Kearny*, 55 Cal., 212; *In re Petty*, 22 Kan., 477. See, also, *Ex parte Cox*, 32 Pac. Rep. [Ida.], 197; *Ex parte Yarbrough*, 110 U.S., 651[, 4 S. Ct. 152, 28 L. Ed. 274 (1884)].) In the case at bar, the jury having, by its verdict, determined the prisoner not guilty as charged, although it further adjudged him guilty of another crime, the trial court had no jurisdiction to sentence him; hence its attempt in that direction was illegal in such sense that it was void, and *habeas corpus* the appropriate remedy. (*In re Betts*, 36 Neb., 282[, 54 N.W. 524 (1893)]; *In re Hav[e]lik*, 45 Neb., 747[, 64 N.W. 234 (1895)].) It follows that the prisoner must be discharged.'"

See, also, *State v. Bensing*, 249 Neb. 900, 547 N.W.2d 464 (1996); *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995). A void sentence is no sentence. *Campbell, supra*. Accordingly, the single sentence imposed for the separate attempted assault and discharge crimes must be vacated and set aside.

*(ii) Use Crime*

McBride further argues that even though the sentence imposed for the use crime is within the possible ranges of punishment therefor, the district court nevertheless abused its discretion by imposing such sentence because it explicitly stated that to correct the error it had made during arraignment, it was treating the conviction as a Class III felony instead of the more severely punishable Class II felony it actually was. McBride argues that the sentence imposed does not exist under current Nebraska law.

We have stated many times that a sentence imposed within statutory limits will not be disturbed on appeal unless the sentencing court's rulings unfairly deprive a litigant of a substantial right and a just result. See, *State v. Earl, ante* p. 127, 560 N.W.2d 491 (1997); *State v. Cook*, 251 Neb. 781, 559 N.W.2d 471 (1997); *State v. Kennedy*, 251 Neb. 337, 557 N.W.2d 33 (1996). Because McBride's sentence for using a deadly weapon to commit a felony was within the permissible ranges of punishment for the crime as the Class II felony it was and within the range about which he was advised at arraignment, McBride cannot show that he was deprived of a substantial right by the district court's treatment of the use crime for the purpose of sentencing as a lesser crime.

### (c) Resolution

Because of the void sentence analyzed in subpart (b)(i) above, this assignment of error is in part meritorious.

### 3. DOUBLE JEOPARDY

In the third assignment of error, McBride avers that the district court incorrectly failed to rule that he was subjected to double jeopardy first by being charged with both the discharge crime and its lesser-included offense, the use crime, and again by being charged with both the discharge crime and the possession of a firearm crime.

### (a) Scope of Review

This assignment of error presents matters of statutory construction; as such, it presents questions of law, see *State v. Thieszen, ante* p. 208, 560 N.W.2d 800 (1997), and is reviewed accordingly.

## (b) Application of Law to Facts

The Double Jeopardy Clause protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. Wolf*, 250 Neb. 352, 549 N.W.2d 183 (1996); *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

The Double Jeopardy Clause precludes multiple punishment for the same offense imposed in a single proceeding. *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996). A determination of whether two convictions in a single trial lead to multiple punishment depends upon whether the Legislature, when designating the criminal statutory scheme, intended that cumulative sentences be applied for conviction on both offenses. *McHenry, supra.*

In *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), the U.S. Supreme Court held that in both the multiple punishment and multiple prosecution contexts, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not. See, also, *State v. Stubblefield*, 249 Neb. 436, 543 N.W.2d 743 (1996). Moreover, in applying the test, the phrase "same offense" means the same whether or not the punishments or prosecutions are successive. *Stubblefield, supra.* See *United States v. Dixon*, 509 U.S. 688, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993).

### (i) Discharge and Use

With that background, we turn to McBride's claim that he was twice put in jeopardy by being separately punished for both discharging and using the same firearm.

The issue is resolved by *McHenry*, 250 Neb. at 635, 550 N.W.2d at 378, wherein we wrote:

A determination of whether two convictions in a single trial lead to multiple punishment depends upon whether the legislature that designated the criminal statutory scheme intended that cumulative sentences be applied for

conviction on both offenses. If the statute clearly and affirmatively indicates that the legislature intended that the defendant be punished cumulatively under both charges and the sentences for both charges are imposed in a single trial, the Double Jeopardy Clause is not offended.

Section 28-1205(3) provides that the crime of using a deadly weapon to commit a felony "shall be treated as [a] separate and distinct [offense] from the felony being committed, and sentences imposed under this section shall be consecutive to any other sentence imposed." See, also, *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996); *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995).

The quoted statutory language expressly provides that the Legislature intended the crime of using a deadly weapon to commit a felony to remain an independent offense from the underlying felony. Furthermore, the crime of using a deadly weapon to commit a felony applies to "[a]ny person who uses a firearm . . . to commit any felony." § 28-1205(1). Accordingly, there can be no question that the Legislature intended that one using a deadly weapon be subjected to cumulative punishments for committing the underlying felony and for the use of the weapon to commit it.

### (ii) Discharge and Possession

This brings us. to McBride's claim that he was twice put in jeopardy by being separately punished for both discharging and possessing the same firearm.

To the extent relevant, one is a felon in possession of a firearm if one possessing a firearm "has previously been convicted of a felony." § 28-1206(1). As noted in subpart (2)(b)(i) above, one unlawfully discharges a firearm if one intentionally discharges it at an occupied motor vehicle. § 28-1212.02.

It is therefore apparent that the one offense is not a lesser-included offense of the other because each requires proof of different elements. One need not be a felon to be proved guilty of discharging a firearm; one need not discharge a firearm to be proved to have been a felon possessing it.

### (c) Resolution

For the foregoing reasons, this assignment of error fails.

## 4. Sufficiency of Evidence

In the fourth assignment of error, McBride challenges the sufficiency of the evidence to support the charges.

### (a) Scope of Review

On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *Mantich, supra.*

### (b) Application of Law to Facts

So viewed, there can be no question that the evidence detailed in part II above supports each of the convictions. The strongest evidence is that two witnesses testified that they saw McBride behind their automobile, both saw him pull out a gun, and one saw McBride fire the gun at the occupied automobile. See *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985) (finding evidence was sufficient to establish requisite "substantial step" for conviction of attempted murder where evidence showed defendant was in firing stance, appeared to point gun at victim, and victim heard gun click four times and saw cylinder advance). There was also evidence that McBride apologized to the owner of the automobile for any damage he might have caused, explaining that he thought the victims were other people; if believed, that evidence amounted to an admission that he did the shooting.

McBride argues that these witnesses were not "objective" because, among other things, the viewing conditions during the shooting were poor and the witnesses' stories had some inconsistencies. He states that he "was convicted solely on the testimony of two adverse and visually impaired witnesses, without a shred of physical evidence." Brief for appellant at 21. However, in determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within a jury's province for disposition. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

### (c) Resolution

Accordingly, this assignment of error also fails.

### 5. Effective Assistance of Counsel

In the fifth and final assignment of error, McBride contends not that his convictions should be vacated and set aside because he did not receive the effective assistance of counsel, but, rather, that we should "reverse the judgments of the [district court]," brief for appellant at 25, because it erred in failing "to ensure that [he] received effective representation by counsel throughout all significant phases of the proceedings below," *id.* at 3.

#### (a) Scope of Review

This assignment presents a question of law and is reviewed as such.

#### (b) Application of Law to Facts

There can be no question that it is the duty of a court to see that justice is administered speedily, without delay, and legally, and is in conformity with constitutional mandates. *State v. Joubert*, 246 Neb. 287, 518 N.W.2d 887 (1994). See, also, *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990). That obviously includes the duty to ensure that a criminal defendant receives a trial which is fair and does not contravene an indigent criminal defendant's Sixth Amendment right to effective counsel. See *State v. Wallace*, 258 Kan. 639, 908 P.2d 1267 (1995).

However, a trial court discharges its duty to ensure a trial which does not contravene an indigent criminal defendant's Sixth Amendment right to effective counsel by appointing, where counsel is required, a qualified attorney to represent the defendant. See *Huff v. State*, 267 Ala. 282, 100 So. 2d 769 (1957). Here, there is no claim that the various attorneys who represented McBride prior to sentencing were not qualified to do so.

Whether they performed ineffectively, as argued by McBride, is an entirely different question and, thus, a question which is not reached by the claim that the district court failed to perform its duty. See, *Pantano v. McGowan*, 247 Neb. 894, 530 N.W.2d 912 (1995) (errors argued but not assigned not considered); Neb. Ct. R. of Prac. 9D(1)d (rev. 1996).

#### (c) Resolution

Therefore, this assignment of error fails.

## IV. JUDGMENT

Because of the error set forth in part III(2)(b)(i) above, the sentence imposed in the first case on the assault and discharge crimes is, as first noted in part III(2)(b)(i) above, vacated and set aside and the cause remanded for resentencing on those crimes; the judgment in the first case is otherwise affirmed, as is the judgment in the second case.

AFFIRMED IN PART, AND IN PART VACATED AND
SET ASIDE AND REMANDED WITH DIRECTION.

WHITE, C.J., participating on briefs.