STATE OF NEBRASKA, APPELLEE, V.
PEDRO N. VIDALES, APPELLANT.
571 N.W.2d 117

Filed November 18, 1997.    No. A-97-006.

Adam J. Sipple and Casey J. Quinn, of Quinn & Wright, for appellant.

Don Stenberg, Attorney General, and Jennifer S. Liliedahl for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

SIEVERS, Judge.

This case concerns judicial disqualification under Neb. Rev. Stat. § 24-739 (Reissue 1995). More specifically, we address

the validity of a district court judge's decision to overrule a defendant's motion to suppress when the judge's wife, a deputy county attorney, was the person responsible for filing the information against that defendant.

## FACTUAL BACKGROUND

On two separate occasions during November 1994, David Stahr, a known cocaine dealer, informed the Omaha Police Division, through Sgt. Mark Langan, of drug activity at 4756 South 19th Street. Apart from these two reports, Langan had never received information from Stahr. On November 16, at approximately 9:45 p.m., Stahr contacted Langan a third time and urged him to immediately go to 4756 South 19th Street because Pedro N. Vidales (Vidales) was selling cocaine.

After receiving the third tip from Stahr, Langan assigned three officers to perform a "knock and talk" investigation to either (1) obtain permission to search the South 19th Street residence or (2) based on the encounter, develop probable cause to obtain a search warrant. The officers, dressed in plain clothes, approached the residence at approximately 10 o'clock that same night, with Langan waiting in a car nearby. At this point, none of the officers knew what Vidales looked like. In response to the officers' knocks, a Hispanic male, who could speak very little English, answered the door. This man was later identified as Fustino Vidales, Vidales' brother. The officers could not specifically recall the substance of the conversation with Fustino, but after the police officers identified themselves and requested entrance into the apartment, Fustino made a motion indicating they could enter.

After the officers were in the apartment, a second male, who spoke better English and was later identified as Jose Vidales, appeared from the kitchen. Fustino and Jose informed the officers that their brother, Vidales, was in Council Bluffs, Iowa. They further reported that there was no one else present in the apartment. Although the officers had no reason to disbelieve that Vidales was in Council Bluffs, they remained in the apartment. After "some time elapsed," a female came out of one of the bedrooms. While she was being questioned, two more females came out of this same bedroom. All three women

informed the officers that Vidales was in Council Bluffs and that there was no one else in the bedroom. A third Hispanic male then entered the apartment through the front door. All six people were asked to consent to a search of their persons and their belongings. At this point, Langan was called to assist in conducting the searches. The three males agreed and were searched. Two of the females agreed and were also searched. The officers found no drugs or weapons. Four people were then allowed to exit the apartment, leaving the three officers with Jose and Fustino.

Thereafter, according to one of the officers present, "I hear the — like the floor creaking, movement inside the bedroom." After hearing the noise, Officer Brian Bogdanoff and Langan approached the bedroom, and they found the door was closed. Upon entering the bedroom, Bogdanoff and Langan saw Vidales quickly move from his position against the wall to the bed, where he sat on a rumpled blanket and put his hands "underneath his person." As Vidales was being secured, Bogdanoff lifted up the blanket, found an electronic gram scale, and conducted a visual search of the bedroom for weapons. During this visual search, Bogdanoff spotted plastic baggies on a shelf. After Vidales refused to consent to a search, explaining that he did not live in the apartment, he was arrested, handcuffed, and seated in the living room with his brothers, who were also handcuffed. The Vidaleses remained handcuffed for approximately 1½ to 2 hours while other officers obtained a search warrant. Upon returning with the warrant, the officers searched the apartment and found cocaine, a razor blade, a spoon with cocaine residue, sandwich bags, and personal letters addressed to Vidales.

Vidales was taken to the Omaha central police station, where he was advised in English of his *Miranda* rights, which he waived, and he was then interviewed. According to the officer who conducted this interview, Vidales admitted to buying cocaine from Stahr and said that the scales belonged to Stahr. Vidales denied selling cocaine but admitted giving cocaine to his friends. The interview was not recorded, and Vidales was not asked to provide a written statement.

## PROCEDURAL BACKGROUND

Vidales was charged on December 14, 1994, by information with unlawful possession with intent to deliver a controlled substance, a Class II felony, in the district court for Douglas County. The information accusing Vidales of the crime was sworn to by Maria R. Moran, Deputy Douglas County Attorney. Prior to the filing of this information, the State of Nebraska sued Vidales for disposition of seized property—money, in the amount of $1,111. This petition was filed November 21, 1994, and was signed under oath by Maria Moran.

At his arraignment on December 22, 1994, Vidales pled not guilty to the charge of unlawful possession with intent to deliver. On January 20, 1995, the amount of $1,111 was forfeited to the State because Vidales failed to answer the petition seeking disposition. Approximately 6 months after the forfeiture, but before his trial on the unlawful possession with intent to deliver charge, Vidales filed a plea in bar seeking to have the possession with intent to deliver charge dismissed because the forfeiture of the money subjected him to double jeopardy in the criminal case. District Judge J. Patrick Mullen overruled Vidales' plea in bar.

Judge Mullen reasoned that a defendant who elects not to contest the forfeiture of his property cannot avoid the adjudication of his personal culpability at that stage and then suddenly assert that the forfeiture has exposed him to double jeopardy when that position becomes advantageous. Vidales filed a motion on Fourth Amendment grounds, seeking to suppress all evidence gained from the search of his person and residence and any and all statements he made to various officers of the Omaha Police Division. Vidales then appealed the judgment on the plea in bar to this court, which we dismissed in our case No. A-95-914.

The felony criminal proceedings were assigned to Judge Gerald E. Moran, who was, at all pertinent times, married to Maria Moran, Deputy Douglas County Attorney and the attorney who filed the two proceedings against Vidales which we have described above.

At the hearing on Vidales' motion to suppress, the State was represented by Anne E. Wilson rather than Maria Moran. Judge Moran took evidence and heard arguments on March 30, 1995,

with respect to the motion to suppress physical evidence. He concluded on that date,

> [T]he Court finds beyond a reasonable doubt that the Defendant's constitutional rights against unlawful search and seizure were not violated and the Motion to Suppress Physical Evidence, therefore, is overruled and the evidence seized as a result of the search in this case shall be admissible at trial.

On April 24, 1995, Judge Moran heard arguments with respect to the motion to suppress statements. At the conclusion of this hearing, Judge Moran again denied Vidales' motion. After these rulings, Judge Moran recused himself from further participation on May 26, citing "conflict." In an affidavit filed March 13, 1996, which appears to have been secured and filed in conjunction with Vidales' request for new hearings on his motion to suppress, Judge Moran stated:

> On December 13th, 1994, an Information charging Pedro N. Vidales with Unlawful Possession With Intent to Deliver Controlled Substance was filed with the Douglas County District Court. The case was assigned to appear before my bench, Courtroom #1. Two separate Motions to Suppress were filed . . . . Subsueqent [sic] to the overruling of the two Motions, the court learned that Maria R. Leslie of the Douglas County Attorney's office, and my wife, had signed the Information. This was brought to my attention on May 19, 1995 and I promptly withdrew myself as judge of Mr. Vidales' case as to not give any appearance of impropriety. At no time prior to the discovery that Maria R. Leslie had signed the Information was this court aware of any reason for this court to disqualify itself.

The case was reassigned to Judge Mullen, and, as mentioned above, Vidales requested another hearing on his motion to suppress. Vidales contended that Judge Moran was disqualified from the case under § 24-739 and that his rulings were thus void. The State objected to an additional hearing, arguing that Judge Moran's order overruling Vidales' previous motion retained its full force and effect. In an order dated April 16, 1996, Judge Mullen stated in part: "Defendant's motion to sup-

press statement and evidence having been previously heard and determined, and no good cause having been shown for further hearing, defendant's motion is overruled."

At Vidales' bench trial, Vidales' counsel objected to the introduction of all the physical evidence and statements covered by the motion to suppress, and secured a continuing objection to the evidence gained by the officers while in the residence and the statements Vidales made to police officers. The objections were overruled. The district court found Vidales guilty of unlawful possession with intent to deliver a controlled substance. After overruling Vidales' motion for new trial, the court sentenced him to a period of 2 to 3 years in the custody of the Nebraska Department of Corrections. Vidales then appealed.

## ASSIGNMENTS OF ERROR

We restate Vidales' assignments of errors, which are that the district court committed reversible error (1) when it failed to grant Vidales a new hearing on his motion to suppress after the first hearing was presided over by a disqualified judge, whose decision to overrule the motion was void; (2) when it overruled Vidales' motion to suppress and related objections at trial and allowed the State to introduce evidence discovered as a result of an unlawful, warrantless entry; (3) when it allowed testimony concerning the analysis of the substances seized from Vidales' residence despite the lack of proper and sufficient foundation concerning the process used to identify the nature of such substances; (4) when it overruled Vidales' motion to dismiss at the close of the State's case; and (5) when it found Vidales guilty despite insufficient evidence as to the nature of the substances seized from his residence.

## STANDARD OF REVIEW

On questions of law, an appellate court has an obligation to reach independent conclusions irrespective of the decision made by the court below. *Sacco v. Carothers*, 253 Neb. 9, 567 N.W.2d 299 (1997); *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997).

## ANALYSIS

We first address Vidales' contention that Judge Moran was disqualified from deciding the motion to suppress and that his

rulings thereupon were and are void. Both the information charging Vidales with the crime and the petition to dispose of the seized money were brought by Maria Moran, the wife of Judge Moran. As far as the record reveals, Maria Moran did not actually appear in court before her husband in connection with this case. Judge Moran presided over the hearing on Vidales' motion to suppress and overruled the same before he recused himself from the case.

■ Vidales contends that the hearings conducted before Judge Moran were improper and that Judge Moran's ruling denying Vidales' motion to suppress was void and of no effect because Judge Moran was disqualified pursuant to § 24-739, which provides:

A judge shall be disqualified from acting as such in the county court, district court, Court of Appeals, or Supreme Court, except by mutual consent of the parties, which mutual consent is in writing and made part of the record, in the following situations:

(1) In any case in which (a) he or she is a party or interested, (b) he or she is related to either party by consanguinity or affinity within the fourth degree, (c) *any attorney in any cause pending in the county court or district court is related to the judge in the degree of parent, child, sibling, or in-law* or is the copartner of an attorney related to the judge in the degree of parent, child, or sibling . . . .

(Emphasis supplied.)

■ One of the principal functions of a judicial disqualification statute is to maintain public confidence in the integrity of the judicial process, which in turn depends upon a belief in the impersonality of the judicial decision-making process. 46 Am. Jur. 2d *Judges* § 88 (1994). In *Zimmerer v. Prudential Ins. Co.*, 150 Neb. 351, 34 N.W.2d 750 (1948), the Nebraska Supreme Court indicated that at common law, a judge was not disqualified by a relationship to a party or person interested in the result of litigation. Disqualification statutes, which changed the common law according to the *Zimmerer* court, " 'are not to be understood as effecting any change in the common law beyond that which is clearly indicated.' " *Id.* at 358, 34 N.W.2d at 754.

Subsection (1)(c) of § 24-739 is of primary interest here, but we do note that in the statute the judge "shall be disqualified"

under (1)(b) where the judge is related to a party by affinity (within the fourth degree). In subsection (1)(c), the judge "shall be disqualified" when there is an attorney in the case who is related to the judge in the degree of "parent, child, sibling, or in-law." Curiously, there is no express statutory disqualification in (1)(c) when the judge-to-attorney relationship is a spousal relationship, but we are convinced that this does not mean a judge can rule on matters in a criminal case brought by his prosecutor-wife.

While the relationship of "spouse" is not specifically included in part (1)(c) of § 24-739, the judge is disqualified when his or her "in-law" is counsel in the case. "In laws" is defined as "Persons related by marriage . . . ," Black's Law Dictionary 787 (6th ed. 1990). "In-law" is defined as "a relative by marriage . . . ," Webster's Encyclopedic Unabridged Dictionary 733 (1989). Webster's at 24 also defines "affinity" as "relationship by marriage . . . ." As defined in Roget's International Thesaurus 6 (1977), the terms "in-laws" and "affinity" are interchangeable. While the term "in-law" as used in § 24-739(1)(c) may well be broad enough to include the spousal relationship, we also find that the law accords the spousal relationship an even higher or more "special" status than that of merely "in-laws."

The obvious intent of the statute is to ensure that parties are not forced to litigate before a partial judge or before a judge who appears to be partial, regardless of whether he or she actually is. A judge must be impartial, and his or her official conduct must be free from even the appearance of impropriety. *Jim's, Inc. v. Willman*, 247 Neb. 430, 527 N.W.2d 626 (1995). The opportunity for, and the appearance of, partiality is undoubtedly greater if a judge is presiding over his or her spouse's case rather than a case brought merely by the judge's sister-in-law. Presumably, a judge's love, respect, and trust of his or her spouse are at the very least equal to that which the judge holds for his or her brother-in-law or sister-in-law. Having stated what is quite obvious, we return to how the law views the spousal relationship.

In determining the question as to whether the term "affinity" included the interspousal relationship for purposes of interpret-

ing who could be eligible under the Florida Crimes Compensation Act, the District Court of Appeal for Florida in *Ocasio v. Bureau of Crimes, etc.*, 408 So. 2d 751, 752 (Fla. App. 1982), cited to *State ex rel. Perez v. Wall*, 41 Fla. 463, 26 So. 1020 (1899), for the following proposition: " 'We do not think it can be maintained that a husband is related to his wife by affinity. They are embraced in the definition of neither affinity nor consanguinity, but are regarded in law . . . as one person.' " See, also, *Strauss v. Strauss*, 148 Fla. 23, 3 So. 2d 727 (1941) (estates by entirety are predicated on unity of husband and wife making them one person in law); *Moran v. Quality Aluminum Casting Co.*, 34 Wis. 2d 542, 150 N.W.2d 137 (1967) (historically, by marriage husband and wife are one person in law). See, also, *State v. Hooper*, 140 Kan. 481, 37 P.2d 52 (1934) (holding that doctrine of affinity grew out of canonical maxim that marriage makes husband and wife one).

While there is authority that husband and wife are one, this common-law notion has a limited reach and utility in the modern world. (For a comprehensive discussion of the evolution of the doctrine, we refer the interested reader to *Heino v. Harper*, 306 Or. 347, 759 P.2d 253 (1988), which quotes extensively from William E. McCurdy, *Torts Between Persons in Domestic Relation*, 43 Harv. L. Rev. 1030 (1930), for the purpose of abolishing the rule of interspousal immunity for negligent personal injury. The *Heino* opinion details how many of the rules which are derived from the "oneness" doctrine have fallen away with the advance of time.) See, also, *Imig v. March*, 203 Neb. 537, 279 N.W.2d 382 (1979) (abolishing interspousal tort immunity in Nebraska). Nevertheless, we find that the common-law doctrine of "oneness" retains a certain small vitality as the basis for the doctrine of affinity. We quote from the Court of Appeals for Maryland in *Criminal Inj. Comp. Bd. v. Remson*, 282 Md. 168, 191-92, 384 A.2d 58, 72 (1978):

> The short of it is that the doctrine of affinity, by its definition and terms, requires that husband and wife be considered as one person. Without that axiom there can be no relationship by affinity. The blood relations of each spouse cannot be related in the same degree to the one spouse as by consanguinity to the other unless husband and wife are

one person so as to exclude the lateral or bridging step between them as a degree. Therefore, no matter to what extent the unity of husband and wife has been otherwise abrogated and the modern doctrine of the equality of husband and wife installed, regardless of the enactment of Married Women's Acts and other legislation under which each of the husband and wife are deemed to be a separate legal personality insofar as disabilities of the wife are abolished, despite however else husband and wife are considered to be separate persons, the unity of the spouses is not obliterated with respect to the doctrine of affinity. When relationship by affinity is recognized, as it is in Maryland, unity of the spouses remains as a necessary element of affinity.

While the common-law notion of "oneness" has been largely abandoned in our modern world, it nonetheless is the underpinning for affinity—without marriage there can be no relation by affinity. Thus, if an attorney's relationship to a judge by affinity or by being an in-law is disqualifying, then surely the spousal relationship from which affinity flows is equally disqualifying. In saying this, we recognize that the spousal relationship is by its very nature broader and deeper than the relationships embraced by affinity.

When construing statutes, we look to the statute's purpose and give it a construction which best achieves that purpose and we presume that the Legislature intended sensible rather than absurd results. *Slagle v. J.P. Theisen & Sons*, 251 Neb. 904, 560 N.W.2d 758 (1997). To construe § 24-739(1) to require disqualification when a judge's brother-in-law appears before the judge but not when his or her spouse does would be the height of absurdity. If a brother-in-law acting as a lawyer in a case causes an automatic disqualification of the judge, a judge's spouse acting as an attorney in a proceeding should also cause a disqualification. This is true regardless of whether the judge and spouse are considered "in-laws" under § 24-739(1)(c) or whether they are "one," which means the judge is sitting on a case in which he is interested, in violation of § 24-739(1)(a). But, there are considerations here beyond § 24-739.

The Code of Judicial Conduct governing disqualification of judges applies to criminal cases, including the arraignment stage of criminal proceedings. 46 Am. Jur. 2d *Judges* § 92 (1994). Neb. Code of Jud. Cond., Canon 3(E) (rev. 1996) provides: "(1) A judge *shall not* participate in any proceeding in which the judge's impartiality reasonably might be questioned, including but not limited to instances where: . . . (d) the judge or the judge's *spouse* . . . (ii) is acting as a lawyer in the proceeding . . . ." (Emphasis supplied.) That there is an absolute disqualification under Canon 3(E)(1)(d)(ii) when a case brought by a spouse-attorney is before the spouse-judge is clear. No one could reasonably suggest that the judge's impartiality could not reasonably be questioned if he or she sits on a case where his or her spouse has been involved as a lawyer. Although Maria Moran did not appear in court in the Vidales prosecution, her instigation of the proceeding by signing the information under oath cannot be considered an act of no consequence. Neb. Rev. Stat. § 23-1201 (Reissue 1991) provides that

> it shall be the duty of the county attorney, when in possession of sufficient evidence to warrant the belief that a person is guilty and can be convicted of a felony or misdemeanor, to prepare, sign, verify, and file the proper complaint against such person and to appear in the several courts of the county and prosecute the appropriate criminal proceeding on behalf of the state and county.

When Maria Moran signed the information, she attested to her belief in Vidales' guilt and that he can be convicted—implying the belief that the evidence against him was lawfully obtained and admissible in a court of law. Thus, the conflict in the case between what Judge Moran must impartially determine and what Maria Moran officially believes as a prosecutor is clear. Thus, the fact that she did not physically appear in the courtroom does not avoid the problem.

■ Based on § 24-739 and the Nebraska Code of Judicial Conduct, we hold that when an attorney in a case is the judge's spouse, the judge is disqualified and may not sit on the case. Therefore, it was improper for Judge Moran to preside over the hearing on Vidales' motion to suppress because Maria Moran,

his wife, was the lawyer who initiated the proceedings. We now turn to the effect of this conclusion.

The State argues that Vidales is not entitled to a new hearing on his motion to suppress because he failed to allege any facts demonstrating prejudice or bias. The State contends:

> The mere fact that Maria Moran signed and filed documents in the case before Judge Moran was a aware [sic] of her involvement with the case did not in any way prejudice or bias the Appellant's right to an impartial trial, because Judge Moran did not even know of his wife's involvement so as to be influenced.

Brief for appellee at 22.

The State suggests that Judge Moran had no knowledge at the time of the hearing and rulings on the motion to suppress that he was involved in a case instigated by his wife, a Douglas County prosecutor, and thus there would be no prejudice to Vidales. However, the State's argument against disqualification flows from the doctrine that "[a] defendant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality." *State v. Richter*, 240 Neb. 913, 918, 485 N.W.2d 201, 205 (1992). Disqualification because a judge is biased or prejudiced is distinct from disqualification of a judge due to his or her relationship to an attorney representing a party in a proceeding. In the first instance, the party alleging such prejudice or bias must overcome the presumption of impartiality. In contrast, the mere existence of the relationship between the judge and the attorney disqualifies the judge, regardless of knowledge or bias, because the statute and the Nebraska Code of Judicial Conduct are mandatory. Section 24-739 says a judge "shall be disqualified" and the Code of Judicial Conduct, Canon 3(E)(1)(d)(ii), says that the judge "shall not participate." The burden is upon the individual judge to determine his qualification to sit on a particular case in the instances of relationships to the parties or their attorneys. *Aetna Life & Casualty Company v. Thorn*, 319 So. 2d 82 (Fla. App. 1975). No showing of bias or prejudice is required—the relationship alone disqualifies.

■ We turn briefly to Judge Moran's affidavit, which appears in our record. There, he states that he disqualified himself as

soon as he became aware that his wife had signed the pleadings to which we have earlier referred, but that before acquiring such knowledge, he had no basis to disqualify himself. Neb. Rev. Stat. § 27-605 (Reissue 1995) provides: "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." The law is clear that the prohibition applies not only to formal testimony but also to whenever the judge assumes the role of a witness. *State v. Rodriguez*, 244 Neb. 707, 509 N.W.2d 1 (1993). A judge's taking the role of a witness in a trial before him or her is manifestly inconsistent with the judge's customary role of impartiality. *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994).

The affidavit obviously puts the judge in the role of a witness, even though it is not formal testimony. Because we view the disqualification as absolute, which dispenses with any need to show prejudice, and Judge Moran may not be a witness in this case, we consider the affidavit no further.

When there is a statutory prohibition precluding a judge from acting, a judgment given in derogation thereof is void and subject to collateral attack. *Walters v. Wiley*, 1 Neb. (Unoff.) 235, 95 N.W. 486 (1901). In *Harrington v. Hayes County*, 81 Neb. 231, 115 N.W. 773 (1908), the claim of disqualification involved a foreclosure action brought by a person with the same name as the district judge who later confirmed the sale. The court first found that identity of names was prima facie evidence of identity of persons and that the disqualification of the judge to act was apparent from the inspection of the record. The court held:

> We have no doubt that where the disqualification of the judge affirmatively appears upon the record, and there is no waiver of such disqualification, as required by statute, the acts of such disqualified judge are void, and it follows in this case that the order of confirmation and proceedings subsequent thereto are invalid and of no effect.

*Id.* at 235, 115 N.W. at 774. The court in *Harrington* also specifically rejected the notion that the confirmation of the sale was a mere formality, saying: "The disqualification of the statute is not a disqualification to decide erroneously. It is a dis-

qualification to decide at all." *Id.* at 236, 115 N.W. at 774. In short, a judgment or other action by a judge disqualified because of his or her relationship with counsel in the case is void and of no effect. See, *King v. Ellis*, 146 Ga. App. 157, 246 S.E.2d 1 (1978); *T. P. B., Jr. v. Super. Ct. for Cty. of Alameda*, 66 Cal. App. 3d 881, 136 Cal. Rptr. 311 (1977); 48A C.J.S. *Judges* § 158 (1981).

Therefore, in the case at hand, it is abundantly clear that Judge Moran was disqualified to act because Maria Moran had acted as an attorney in a case pending before him. Due to this disqualification, Judge Moran's decisions in the case are void and of no effect. Consequently, we do not reach the question of whether he correctly decided the motions to suppress. However, we do observe in passing that drug possession cases, in our experience, are often decided in large part by the outcome of the hearings on motions to suppress. The facts of the case present issues of substance for a judge ruling on a suppression motion, and the ruling thereupon was not inconsequential. Thus, because Judge Moran's decision to deny suppression of evidence was void and of no effect, a new suppression hearing was required and the decision of Judge Mullen that "no cause" had been shown for such a hearing was incorrect.

We therefore reverse the conviction and remand the matter to the district court for new suppression hearings. Although there are other assignments of error, the only other one we touch upon is the claim that the evidence was wholly insufficient as to the nature of the substances seized from Vidales' apartment. The law is that when there is a claim of trial error and a claim of insufficient evidence, we must remand the cause for a new trial if the evidence appears sufficient to uphold the conviction when the claim of trial error is sustained. *State v. Christner*, 251 Neb. 549, 557 N.W.2d 707 (1997). In this case, we find that there appears to be sufficient evidence to sustain the conviction, if such evidence were ultimately deemed admissible—a matter upon which we neither express nor imply any opinion. Therefore, we remand the matter for a new suppression hearing and such further proceedings thereafter as may be appropriate.

REVERSED AND REMANDED WITH DIRECTIONS.