Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/02/2022 09:07 AM CDT

State of Nebraska, appellee, v.
Antoine C. Johnson, appellant.

___ N.W.2d ___

Filed July 26, 2022.    No. A-21-611.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
4. **Pretrial Procedure: Appeal and Error.** Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion.
5. **Double Jeopardy: Lesser-Included Offenses: Appeal and Error.** Whether two provisions are the same offense for double jeopardy purposes presents a question of law, on which an appellate court reaches a conclusion independent of the court below.
6. **Rules of Evidence: Judicial Notice: Trial.** A fact is adjudicative if the fact affects the determination of a controverted issue in litigation.
7. **Judicial Notice.** Judicial notice of an adjudicative fact may be taken at any stage of the proceedings.
8. **Criminal Law: Juries: Judicial Notice.** In a criminal case, the jury may, but is not required to, accept as conclusive any fact judicially noticed.

9. **Pretrial Procedure: Prosecuting Attorneys: Evidence: Impeachment: Words and Phrases.** The prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial. Favorable evidence includes both exculpatory and impeachment evidence.

10. **Criminal Law: Due Process: Witnesses.** The existence of an agreement to testify by a witness under threats or promises of leniency made by the prosecutor is relevant to the credibility of such witness, and failure to bring that to the attention of the jury denies the defendant due process of law.

11. **Prosecuting Attorneys: Evidence.** Where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed at trial, *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), is not violated.

12. **Constitutional Law: Criminal Law: Pretrial Procedure.** While *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), impose a constitutional mandate for disclosure in criminal cases, a statutory design such as Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2020) can exact more than the constitutional minimum, so that courts must focus on information potentially useful to the defense.

13. **Pretrial Procedure: Prosecuting Attorneys: Evidence.** Under Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2020), whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.

14. **Criminal Law: Pretrial Procedure.** Discovery in a criminal case is generally controlled by either a statute or a court rule.

15. **Pretrial Procedure: Evidence.** Pursuant to Neb. Rev. Stat. § 29-1912(1) (Cum. Supp. 2020), following a proper discovery request, the State has an obligation to disclose information which is material to the presentation of a defense to the charge against the defendant.

16. **Criminal Law: Courts.** When a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction that will adequately punish the government and secure future compliance.

17. **Rules of Evidence: Other Acts: Proof.** Neb. Rev. Stat. § 27-405(2) (Reissue 2016) permits a defendant to place specific examples of a person's prior violent conduct before the jury to the extent that such evidence of a person's violent character is relevant to the proof of a defendant's self-defense claim.

18. **Rules of Evidence: Other Acts.** Under Neb. Rev. Stat. § 27-404(2) (Supp. 2019), evidence of a defendant's other crimes, wrongs, or acts may be admissible for purposes of demonstrating the defendant's consciousness of guilt.

19. \_\_\_\_: \_\_\_\_. Under Neb. Rev. Stat. § 27-404(3) (Supp. 2019), the prosecution must state the specific purpose or purposes for which the evidence is offered, and the trial court must similarly state the purpose or purposes for which the evidence is received.

20. \_\_\_\_: \_\_\_\_. When receiving evidence pursuant to Neb. Rev. Stat. § 27-404(2) (Supp. 2019), the trial court must consider whether the evidence is independently relevant and whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

21. **Criminal Law: Judgments: Appeal and Error.** An appellate court will affirm a trial court's ruling that the defendant committed an uncharged extrinsic crime or bad act if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found with a firm conviction the essential elements of the uncharged crime or bad act.

22. **Other Acts: Evidence: Appeal and Error.** Just as when reviewing a sufficiency of the evidence claim regarding a conviction, an appellate court, when reviewing the sufficiency of an extrinsic crime or bad act, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.

23. **Double Jeopardy.** The Double Jeopardy Clause protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.

24. **Constitutional Law: Double Jeopardy.** The protection provided by Nebraska's double jeopardy clause is coextensive with that provided by the U.S. Constitution.

25. **Statutes: Double Jeopardy: Legislature: Intent: Sentences.** Where two statutory provisions proscribe the same offense, they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent.

26. **Double Jeopardy: Legislature: Intent.** The statutory elements test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), does not apply when there is clear legislative intent regarding whether conduct involves a single offense or multiple offenses.

27. **Double Jeopardy: Legislature: Intent: Sentences.** When the Legislature has demonstrated an intent to permit cumulative punishments, the

Double Jeopardy Clause is not violated as long as the court imposes the cumulative punishments in a single proceeding.

28. **Statutes: Judicial Construction: Legislature: Intent: Presumptions.** Where a statute has been judicially construed and that construction has not evoked amendment, it will be presumed that the Legislature acquiesced to the court's determination of the Legislature's intent.

29. **Criminal Law: Weapons: Political Subdivisions: Sentences.** Any person committing the felony of discharging a firearm in a city of the first class pursuant to Neb. Rev. Stat. § 28-1212.04 (Reissue 2016) shall be subjected to cumulative punishments in a single proceeding for both the offense of discharging a firearm and the offense of using a deadly weapon to commit that felony.

30. **Double Jeopardy: Legislature: Statutes: Trial: Sentences.** Where a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), a court's task of statutory construction ends and cumulative punishment under such statutes in a single trial may be imposed.

Appeal from the District Court for Hall County: John H. Marsh, Judge. Affirmed.

Gerard A. Piccolo, Hall County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Moore, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Following a jury trial, Antoine C. Johnson was convicted of one count of attempted second degree murder, one count of first degree assault, one count of discharge of a firearm in a city of the first class, and three corresponding counts of use of a deadly weapon (firearm) to commit a felony. Johnson appeals his convictions and sentences, claiming several evidentiary errors. He also contends that imposing consecutive sentences on the offenses of discharge of a firearm and corresponding

use of a firearm to commit a felony violates the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions because the two offenses "are the same crime, double punishment." We affirm.

## II. BACKGROUND

On May 27, 2020, Johnson, along with Gary Zierke III, Roy Rodriguez, and April Hardy, traveled from Lincoln, Nebraska, to Grand Island, Nebraska. The evidence conflicts concerning their purposes in traveling to Grand Island, although trial testimony generally indicated that Johnson and Zierke were looking to purchase methamphetamine in Grand Island. The four individuals left between 9 and 10 p.m. Rodriguez drove a Chevrolet Trailblazer, while Hardy, his "fiancee" of 20 years, sat in the front passenger seat; Johnson and Zierke rode in the back seat. Rodriguez and Hardy were familiar with both Johnson and Zierke, but Johnson and Zierke were not acquainted with each other.

The group arrived in Grand Island between 11 p.m. and midnight, and Zierke directed Rodriguez to a residence belonging to his cousin, Ricardo Aguilar. Tara Aguilar, a cousin to both Ricardo and Zierke, also lived at this residence. After finding a place to park, Zierke entered the residence. Approximately 15 minutes later, Johnson exited the Trailblazer and knocked on the door. A "young lady" answered and "gestured" Johnson inside. He was directed toward a bedroom wherein he found Zierke, Tara, and Ricardo talking amongst themselves. The three were "alarmed" by Johnson's entry, although Johnson apologized and explained that it was a misunderstanding. Ricardo told Johnson to "get out" of his home, and he, along with Zierke, proceeded to escort Johnson outside. Zierke and Ricardo went back inside, but Zierke came out again a few minutes later. Johnson gave Zierke the money pooled to purchase methamphetamine, and Zierke again went inside the residence.

At some later point, unbeknownst to Johnson, Zierke left with Tara and her two daughters in a borrowed vehicle. Ricardo and his girlfriend subsequently left the residence, and Johnson

approached the two, wanting to know where Zierke was. The record is conflicted concerning the nature of the conversation between Johnson and Ricardo, although testimony indicated that Johnson was frustrated due to the delay in Zierke's return. Ricardo, Rodriguez, and Hardy observed Johnson to have something underneath his shirt, and Ricardo believed Johnson to be carrying a firearm. Ricardo informed Johnson that Zierke had left with Tara just a few minutes prior. After a brief exchange, Ricardo entered the Trailblazer, followed by Johnson, although the record is conflicted as to whether Ricardo did so voluntarily.

At Johnson's urging, Ricardo called Tara to find out where Zierke had gone. Either Tara or Zierke answered, and Ricardo directed Rodriguez as he drove to meet up with Tara and Zierke. The two groups met near an intersection, parking near each other. Johnson and Zierke left their respective vehicles and approached each other. Johnson demanded that Zierke return his money, and the subsequent argument ended when Johnson drew a revolver and fired one shot at Zierke, striking him in the head. Eyewitness accounts conflict as to what transpired between Johnson and Zierke during this encounter, and we note that Johnson claimed that Zierke "sprint[ed]" toward Johnson in a threatening manner while yelling that he was "going to beat [Johnson's] fucking ass." At some point during the exchange, Ricardo ran from the Trailblazer, but he returned to the scene after Johnson shot Zierke. Following the shooting, Johnson ran back to the Trailblazer, and he, Rodriguez, and Hardy drove off. Tara subsequently contacted law enforcement, and Zierke was taken to a hospital for emergency treatment.

Johnson, Rodriguez, and Hardy headed back to Lincoln following the shooting. As they drove, Johnson repeatedly made statements such as "[Y]'all don't know who I am" and "[Y]ou don't know me." On the way back to Lincoln, a Nebraska state trooper initiated a traffic stop of the Trailblazer. During the stop, Johnson, who was seated in the back seat, fled from

the vehicle through a nearby field. The trooper unsuccessfully pursued Johnson and returned to the Trailblazer a few minutes later. Rodriguez and Hardy were placed under arrest, and law enforcement discovered a gun underneath the vehicle's driver's seat. Approximately 16 hours later, law enforcement arrested Johnson.

On July 28, 2020, the State filed an information in the Hall County District Court charging Johnson with attempted first degree murder (count I), a Class II felony, in violation of Neb. Rev. Stat. §§ 28-303(1) and 28-201(1)(b) (Cum. Supp. 2020); first degree assault (count III), a Class II felony, in violation of Neb. Rev. Stat. § 28-308(1) (Reissue 2016); kidnapping (count V), a Class IA felony, in violation of Neb. Rev. Stat. § 28-313(1) (Reissue 2016); discharge of a firearm in a city of the first class (count VII), a Class IC felony, in violation of Neb. Rev. Stat. § 28-1212.04 (Reissue 2016); robbery (count IX), a Class II felony, in violation of Neb. Rev. Stat. § 28-324(1) (Reissue 2016); and five counts of use of a deadly weapon to commit a felony (counts II, IV, VI, VIII, and X), a Class IC felony, in violation of Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Reissue 2016). The State subsequently filed an amended information on August 12, dismissing counts IX and X while retaining all other counts.

A jury trial was held from May 10 to 18, 2021. Evidence was adduced, as set forth above; witnesses included, among others, Johnson, Zierke, Rodriguez, Hardy, Ricardo, Tara, and several members of law enforcement. We will describe specific testimony and exhibits in our analysis below as relevant to the issues on appeal. Following deliberation, the jury found Johnson guilty of attempted second degree murder, first degree assault, discharge of a firearm in a city of the first class, and three counts of use of a deadly weapon (firearm) to commit a felony corresponding to the previous felonies. The jury found Johnson not guilty on the count of kidnapping and the corresponding count of use of a deadly weapon (firearm) to commit a felony.

A sentencing hearing was held on July 21, 2021. The district court sentenced Johnson to 20 to 30 years' imprisonment on count I (attempted second degree murder); 10 to 20 years' imprisonment on count III (first degree assault); and 10 to 20 years' imprisonment on count VII (discharge of a firearm in a city of the first class). The court ordered these sentences to be served concurrently. The court further sentenced Johnson to 5 to 10 years' imprisonment on each count of use of a deadly weapon (firearm) to commit a felony (counts II, IV, and VIII) and ordered these sentences to run consecutively to each other and to the sentences imposed for counts I, III, and VII. All four of the firearm convictions are Class IC felonies, each requiring a mandatory minimum sentence of 5 years' imprisonment. The sentences imposed resulted in an aggregate sentence of 35 to 60 years' imprisonment. Johnson objected to the consecutive sentences imposed for counts VII and VIII on double jeopardy grounds.

Johnson appeals.

### III. ASSIGNMENTS OF ERROR

Johnson claims, reordered, that the district court erred in (1) taking judicial notice of the population of Grand Island and admitting exhibit 53, (2) failing to disqualify Tara from testifying due to the State's failure to disclose her cooperation agreement pursuant to the court's discovery order, (3) not allowing Ricardo's prior convictions into evidence, (4) admitting evidence under Neb. Rev. Stat. § 27-404 (Supp. 2019) regarding an incident in the courthouse during the course of trial, and (5) imposing consecutive sentences on counts VII and VIII, in violation of the Double Jeopardy Clause because they are "double punishment" for the same crime.

### IV. STANDARD OF REVIEW

[1,2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining

admissibility. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Figures, supra*.

[3] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

[4] Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020).

[5] Whether two provisions are the same offense for double jeopardy purposes presents a question of law, on which an appellate court reaches a conclusion independent of the court below. *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

## V. ANALYSIS

### 1. Judicial Notice of Grand Island's Population and Classification

Johnson claims the district court erred in taking judicial notice of the population of Grand Island and its classification.

### (a) Background

During trial and upon the State's motion, the district court took judicial notice that the population of the "City of Grand Island [was] between 5,000 and 100,000 residents," "making it a City of the First Class." The court's decision was premised on the receipt of exhibit 53, which contains a picture of a sign designating Grand Island's population as 48,520 and multiple pages from the website of the U.S. Census Bureau setting forth Grand Island's population parameters based on the 2010 decennial census (48,520) and a population estimate as of July 1, 2019 (51,267). Johnson objected to exhibit 53 on the "grounds of hearsay and foundation as

to hearsay," and he objected to the court's judicial notice of Grand Island's population and classification without further elaboration. He also noted that exhibit 53 was never disclosed by the State prior to trial.

(b) Analysis

On appeal, Johnson alleges that "[t]he State failed to provide enough 'proof'" from which the district court could take judicial notice of Grand Island's population and corresponding classification. Brief for appellant at 31. He argues that under Neb. Rev. Stat. § 16-101 (Cum. Supp. 2020) (defining cities of the first class as having more than 5,000 and not more than 100,000 inhabitants "as determined by the most recent federal decennial census or the most recent revised certified count by the United States Bureau of the Census"), as incorporated through § 28-1212.04 (discharge of firearm in city of first class), a city's classification as a city of the first class may only be proved as set forth in § 16-101. Johnson claims that exhibit 53 fails to satisfy the statutory requirements and that therefore, the district court lacked an appropriate basis to take judicial notice of Grand Island's population and classification.

[6-8] Neb. Rev. Stat. § 27-201(2) (Reissue 2016) permits a trial court to take judicial notice of adjudicative facts that are "not subject to reasonable dispute," such that those facts are either "generally known within the territorial jurisdiction of the trial court" or otherwise "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." A fact is adjudicative if the fact affects the determination of a controverted issue in litigation. *State v. Vejvoda*, 231 Neb. 668, 438 N.W.2d 461 (1989). Judicial notice of an adjudicative fact may be taken at any stage of the proceedings. *Id.* In a criminal case, the jury may, but is not required to, accept as conclusive any fact judicially noticed. See § 27-201(7).

While Johnson asserts that the proof provided by the State was insufficient to support the district court's judicial notice of Grand Island's population and classification, we cannot say

the court erred in this matter. Johnson's argument emphasizes that "[t]here [was] nothing verifying" that the census information in fact came "from the Census Bureau or a governmental record." Brief for appellant at 30. However, the State asserted that exhibit 53 included "Census Bureau data" from the corresponding federal government website. These pages also cite to the 2010 decennial census conducted by the federal government and further provide a link to the specific web page on the U.S. Census Bureau website setting forth Grand Island's population metrics. Upon our review, we find that the population of Grand Island would certainly be a fact "generally known within the territorial jurisdiction" of the Hall County District Court and thus would be an adjudicative fact subject to judicial notice. See § 27-201. However, to the extent that § 16-101, as incorporated through § 28-1212.04, may require that a city's classification be proved solely through the "most recent federal decennial census or the most recent revised certified count by the United States Bureau of the Census," we find that exhibit 53 sufficiently satisfies any such requirement in this case. Accordingly, the district court did not err in taking judicial notice of Grand Island's population and classification as a city of the first class.

### 2. State's Late Disclosure of Cooperation Agreement

Johnson claims the district court erred in not disqualifying Tara from testifying when the State failed to timely turn over Tara's cooperation agreement with the State to Johnson in compliance with the court's pretrial discovery order.

### (a) Background

On August 12, 2020, Johnson filed multiple pretrial motions concerning various discovery matters, including a "Motion for Discovery" that included a request for, in pertinent part, "[e]xculpatory evidence" as required under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342

(1976); and *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). The district court subsequently entered an order on August 19 granting Johnson's motions, including the "Motion for Discovery," and giving the State 30 days to comply with the order.

Jury selection commenced and concluded on Monday, May 10, 2021. The following morning, prior to when the jury was brought into the courtroom, Johnson's counsel orally motioned the court to order that "Tara . . . not be allowed to testify" at trial. Defense counsel stated that "on Friday," he had just received the cooperation agreement concerning Tara from the State. The cooperation agreement was dated December 17, 2020, and indicated that Tara agreed to testify for the State in exchange for beneficial outcomes in unrelated cases pending against her.

In response, the State argued that Johnson's counsel was put "on notice" of the cooperation agreement during Tara's deposition on November 6, 2020. Our record does not include Tara's deposition, but the State related that upon inquiry by Johnson's counsel, Tara stated that she was "going to get some kind of benefit out of" her agreement to testify and that the benefit might be "for [her] case that [she had] pending." The State then "intercepted" Tara's response during the deposition and "explained that [the State and Tara hadn't] reached a final conclusion" regarding any cooperation agreement. The State stated that it typically holds cooperation agreements until just before trial "to make sure the case is actually going to proceed to trial." The district court thereafter overruled the motion to disqualify Tara's testimony.

(b) Analysis

Johnson contends the district court erred in allowing Tara to testify over his motion to disqualify. While he concedes the district court had "a great deal of discretion" in handling failures to comply with discovery orders, the court's decision to "impose[] no sanction whatsoever, despite the State admitting it was not going to comply with the Court's order until the

day before trial," amounted to an abuse of discretion. Brief for appellant at 32.

[9-11] We initially address an alleged error raised and argued by Johnson at oral argument, but as pointed out by the State in response, was not raised in Johnson's initial brief; namely, that the State's late delivery of Tara's cooperation agreement to Johnson violated *Brady v. Maryland, supra*. "In *Brady*, the U.S. Supreme Court held that the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial. Favorable evidence includes both exculpatory and impeachment evidence." *State v. Howard*, 29 Neb. App. 860, 870-71, 961 N.W.2d 560, 570 (2021). See, also, *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014) (existence of agreement to testify by witness under threats or promises of leniency made by prosecutor is relevant to credibility of such witness and failure to bring that to attention of jury denies defendant due process of law). However, where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated. *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017). Accordingly, because Tara's cooperation agreement was disclosed prior to trial and Tara was questioned about the agreement by both the prosecutor and defense counsel during trial, the constitutional requirements of *Brady* are not implicated in this appeal.

[12,13] Notably, while *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Kyles v. Whitley*, 514 U.S 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), "impose a constitutional mandate for disclosure in criminal cases, a statutory design for discovery such as § 29-1912 can exact more than the constitutional minimum, so that courts must focus on information potentially useful to the defense." *State v. Kula*, 252 Neb. 471, 486, 562 N.W.2d 717, 727 (1997). In *Kula*, the Nebraska Supreme Court concluded that the appellant was prejudiced by the district court's failure to grant a continuance when the State waited until the first day of trial to produce police reports that would have led the defense to discover

witnesses and account for their testimony prior to trial. In focusing on discovery requirements, the court stated:

> Under § 29-1912, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.

*State v. Kula*, 252 Neb. at 486, 562 N.W.2d at 727. We therefore place our focus on the discovery requirements as assigned and argued by Johnson.

[14-16] Discovery in a criminal case is generally controlled by either a statute or a court rule. *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021). Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. *Id.* Neb. Rev. Stat. § 29-1919 (Cum. Supp. 2020) provides:

> If, at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with sections 29-1912 to 29-1921 or an order issued pursuant to [those sections], the court may:
>
> (1) Order such party to permit the discovery or inspection of materials not previously disclosed;
>
> (2) Grant a continuance;
>
> (3) Prohibit the party from calling a witness not disclosed or introducing in evidence the material not disclosed; or
>
> (4) Enter such other order as it deems just under the circumstances.

Pursuant to Neb. Rev. Stat. § 29-1912(1) (Cum. Supp. 2020), following a proper discovery request, the State has an obligation to disclose information which is material to the presentation of a defense to the charge against the defendant. See

*State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012). When a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction that will adequately punish the government and secure future compliance. *State v. Short, supra*. The Nebraska Supreme Court has described its preference for a continuance in such situations where the continuance could cure any prejudice caused by the government's noncompliance. See *id.*

Upon our review of the record, we are not persuaded that Johnson was prejudiced by the State's delay in turning over its cooperation agreement with Tara such that the district court should have disqualified her from testifying. We are unable to discern from this record, nor does Johnson explain, how receiving the cooperation agreement earlier was material to the preparation of Johnson's defense, such that it would have played an important role in uncovering admissible evidence, aided in the preparation of witnesses, aided with corroborating testimony, or assisted in impeachment or rebuttal. See *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997). We also note that Johnson's counsel did not contest the State's description of the deposition held on November 6, 2020. The deposition responses read into the record by the State indicated that Johnson's counsel was made aware of the cooperation agreement at that time. Moreover, the State turned over the cooperation agreement prior to trial, and the fact that Tara was receiving a benefit in exchange for her testimony was brought to the jury's attention by both the State and Johnson during Tara's testimony. We also observe, as Johnson concedes on appeal, that he could have requested a continuance as a cure to any prejudice suffered, yet he failed to do so.

We are also not persuaded by the State's excuse for the delay in producing the cooperation agreement to Johnson in compliance with the district court's discovery order; however, in this instance, the State's delay did not result in prejudice to Johnson because the cooperation agreement was not material to the preparation of his defense for the reasons stated above.

Therefore, we cannot say the district court abused its discretion in allowing Tara to testify.

### 3. Admissibility of Ricardo's
### Prior Convictions

Johnson next claims that the district court erred in preventing the impeachment of Ricardo's testimony with evidence of Ricardo's prior convictions pursuant to Neb. Rev. Stat. § 27-405 (Reissue 2016).

### (a) Background

During the course of the State's direct examination of Ricardo, he testified that he had a past history of violent behavior, including his involvement in several fights when he was younger. Ricardo also testified that when Johnson approached him outside of his home after their first encounter inside, he had thoughts of striking Johnson with the beer bottle in his hand "to defend [him]self" due to his belief that Johnson was carrying a firearm.

During cross-examination, Johnson's counsel wished to reference Ricardo's prior criminal history and put into evidence records of Ricardo's prior convictions for violent crimes (marked as exhibits 42 and 44 through 47) as demonstrating Ricardo's violent character. Following an offer of proof outside the presence of the jury, the court ruled that these exhibits were admissible only upon Ricardo's denial of the conduct underlying these records; the exhibits were otherwise inadmissible. Upon cross-examination into his history of violent behavior, Ricardo denied committing kidnapping and robbery in January 2010, and exhibit 42, which contained records of Ricardo's convictions for these offenses, was received into evidence. Ricardo similarly denied having committed robbery in an incident in September 2010, although exhibit 46, which contained the records of his conviction for this offense, was not offered into evidence upon Ricardo's denial. On further examination, Ricardo conceded to having previously engaged

in multiple specific instances of violent conduct in 2010, 2009, and 1996. Ricardo further acknowledged having been incarcerated for an unspecified period between 2010 and the time of trial.

### (b) Analysis

Johnson argues that the district court erred in not allowing evidence of Ricardo's prior convictions to be used to demonstrate specific instances of Ricardo's violent character. He asserts that this evidence was admissible under § 27-405 and that the cases *State v. Sims*, 213 Neb. 708, 331 N.W.2d 255 (1983), and *State v. Lowe*, 244 Neb. 173, 505 N.W.2d 662 (1993), permit the "presentation of specific incidents of a witness['] conduct." Brief for appellant at 33. Johnson does not provide any elaboration or additional context concerning his argument in his initial brief. Ordinarily, an argument that does little more than restate an assignment of error does not support the assignment, and an appellate court will not address it. See *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). Nevertheless, since Johnson provides further explanation in his reply brief, we will address why we find no error by the district court in its handling of Ricardo's past convictions.

[17] Section 27-405(2) provides that "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." This rule permits a defendant to place specific examples of a person's prior violent conduct before the jury to the extent that such evidence of a person's violent character is relevant to the proof of a defendant's self-defense claim. See *State v. Sims, supra* (evidence of homicide victim's assault of another individual was relevant to defendant's claim that victim was first aggressor).

While the record and Johnson's initial brief are not clear concerning the relevance of Ricardo's violent character, he argues in his reply brief that this evidence was relevant to his self-defense claim because he "could reasonably conclude

. . . that [Ricardo], [Tara], and [Zierke] were all in 'the scam' together and . . . were a threat to him." Reply brief for appellant at 6. He notes several pieces of testimony that he claims indicated Ricardo was party to the alleged scheme, including the evidence that (1) Zierke led the group to Ricardo's home; (2) Zierke, Ricardo, and Tara were having a conversation in the bedroom before Zierke and Ricardo removed Johnson from the residence; and (3) Ricardo fled from the scene of the shooting and refused to cooperate with police.

However, the record does not indicate that Johnson raised a self-defense claim during trial concerning Ricardo's conduct. Rather, Johnson's self-defense claim addressed only Zierke's alleged conduct at the encounter just prior to the shooting. Moreover, there was no evidence offered at trial indicating that Ricardo threatened Johnson or that Johnson ever perceived Ricardo as a threat in the moments leading up to the shooting. Trial testimony uniformly indicated that Ricardo ran from the Trailblazer during the encounter between Zierke and Johnson and that Ricardo returned to the scene only after Johnson had shot Zierke. There were conflicting accounts as to when precisely Ricardo returned, insofar as Johnson testified that Ricardo was "standing right there" immediately after he shot Zierke, whereas Tara and Ricardo testified that he returned after Johnson, Rodriguez, and Hardy left in the Trailblazer. Nothing in the record supports Johnson's argument that Ricardo's violent character was relevant to his self-defense claim, because Ricardo was not involved in the encounter that ended with Johnson's shooting Zierke. Accordingly, we conclude that the district court did not abuse its discretion in ruling exhibits 44 through 47 otherwise inadmissible if Ricardo did not deny the underlying violent conduct.

### 4. § 27-404 Evidence

Johnson claims the district court erred in admitting evidence under § 27-404 concerning an encounter between Johnson, Rodriguez, and Hardy during trial.

(a) Background

On May 13, 2021, an incident occurred in the courthouse involving Johnson, Rodriguez, and Hardy with multiple corrections officers present. Rodriguez and Hardy were seated near the courthouse's elevator after the close of testimony. As Johnson was escorted by corrections officers to the elevator, he made statements toward Rodriguez and Hardy, as well as subsequent statements in the presence of the corrections officers. Accounts of Johnson's statements conflict, and we proceed to summarize the testimony provided during the § 27-404 hearing held on May 14.

Sean Bramble was one of the corrections officers assigned to transport Johnson to and from the courthouse during trial. Bramble testified that as he escorted Johnson to the elevator, Johnson "made a statement that [Rodriguez] was smirking at him" and became upset, although he "didn't hear quite everything" Johnson said at the elevator. Bramble did not remember whether either Rodriguez or Hardy said anything to Johnson. However, Bramble recalled that when Johnson and the officers were in the tunnel below the courthouse, Johnson stated that "he had addresses of where [Rodriguez and Hardy] live, and he could have their heads whenever he wanted to." Bramble believed that this statement was "less of a threat" and rather "something [Johnson] could do if he wanted to."

Gregory Thompson was also assigned to transport Johnson to and from the courthouse on May 13, 2020. Thompson testified that as Johnson was escorted to the elevator, Johnson "turned back towards" Rodriguez and Hardy and began speaking to them. Thompson loudly told Johnson, "No talking," multiple times "to drown out any conversation trying to be had." Thompson was not able to make out anything said by Johnson to Rodriguez and Hardy. However, Thompson recalled that in the tunnel below the courthouse, Johnson said that he "still [knew] where [Rodriguez and Hardy] live and [that] if [he] wanted [he] could have them whacked." Thompson considered

this "more of a . . . broad statement" than a threat, but he still found Johnson's statement "[c]oncerning."

Rodriguez recalled that he and Hardy were waiting near the courthouse elevator that evening for the prosecutor to "come tell [them] what to do." Rodriguez testified that as officers escorted Johnson to the elevator, Johnson "said his brother's coming after [him]," which Rodriguez understood to mean that Johnson's brother was going "[t]o go shoot up [his] house . . . or come kill [him or his] family." Rodriguez considered this statement to be a threat.

Hardy similarly recalled waiting for the prosecutor near the courthouse elevator. Hardy testified that as Johnson was escorted to the elevator, she "understood [Johnson] to say, ['T]hat's fucked up, man, and my brother's going to get you.[']" Hardy believed this statement to be a threat that Johnson's brother was "going to probably attempt to do something to us for testifying." She testified that she was not looking at Johnson when he made these statements, as she was talking to Rodriguez at that moment.

Johnson testified that as he left the courtroom toward the courthouse elevator, he saw that Rodriguez "was smirking at [him]." Johnson then said in response, "[M]other fucker, that's fucked up. Why you sitting there smirking at me, bro? That's just fucked up, man." Johnson recalled that when he entered the elevator, he "still was expressing . . . that it was wrong that [Rodriguez] was sitting there smirking at [him] like that." He later said that "if [he] wanted to do something to [Rodriguez and Hardy], [he] could have just sent the paperwork and had something done." Johnson did not dispute the testimonies of Bramble and Thompson concerning his statements, but he denied saying "anything about [his] brother" and "hav[ing] the ability to have something done" to Rodriguez and Hardy.

After considering the offered testimony, the district court found by clear and convincing evidence that Johnson "made statements, including statements to the corrections officers, that he could have something happen to the witnesses; and that

he made statements to witnesses Rodriguez and Hardy that his brother was going to get them." The court found these statements "relevant towards consciousness of guilt," but chose to exclude the "statements [by Johnson] to the corrections officers" pursuant to Neb. Rev. Stat. § 27-403 (Reissue 2016) due to the risk of "the jury just accepting [those statements] as bad character on the part of [Johnson]." The court thereafter permitted Rodriguez and Hardy to testify to Johnson's statements with the jury present. Johnson requested permission to call the corrections officers to testify to rebut the testimonies of Rodriguez and Hardy, and the court granted this request. The witnesses thereafter testified before the jury consistently with their prior testimony.

### (b) Analysis

Johnson argues that the district court abused its discretion in finding that the State proved by clear and convincing evidence that he had threatened Rodriguez and Hardy at the courthouse elevator. He claims that because "only two out of five witnesses testified to . . . Johnson's brother coming to get them," the State failed to meet the clear and convincing evidence standard under § 27-404. Brief for appellant at 32.

[18] Section 27-404(1) generally prohibits the admission of "[e]vidence of a person's character or a trait of his or her character . . . for the purpose of proving that he or she acted in conformity therewith on a particular occasion[.]" However, "[e]vidence of other crimes, wrongs, or acts . . . may . . . be admissible for other purposes . . . ." § 27-404(2). Such purposes may include demonstrating a defendant's consciousness of guilt. See *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017) (defendant's letter to witness was intended to threaten her prior to her testimony at trial, and letter was relevant to show his consciousness of guilt).

[19,20] Pursuant to § 27-404(3), "evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court [outside

the presence of the jury] by clear and convincing evidence that the accused committed the crime, wrong, or act." The prosecution must state the specific purpose or purposes for which the evidence is offered, and the trial court must similarly state the purpose or purposes for which the evidence is received. See *State v. Burries*, *supra*. The court must then consider whether the evidence is independently relevant and whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. See *id.*

[21,22] Johnson's argument on appeal contests solely whether the State satisfied its burden to prove by clear and convincing evidence that Johnson made threatening statements toward Rodriguez and Hardy. An appellate court will affirm a trial court's ruling that the defendant committed an uncharged extrinsic crime or bad act if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found with a firm conviction the essential elements of the uncharged crime or bad act. See *State v. Kofoed*, 283 Neb. 767, 817 N.W.2d 225 (2012). Further, just as when reviewing a sufficiency of the evidence claim regarding a conviction, an appellate court, when reviewing the sufficiency of an extrinsic crime or bad act, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. See *id.* (holding that standard for reviewing sufficiency of evidence claims regarding conviction applies equally to reviewing sufficiency of evidence claims in context of § 27-404).

Johnson's argument essentially asks this court to reweigh the credibility of the testimony provided at the § 27-404 hearing. As previously set forth, it is not within the scope of our appellate review to resolve conflicts in the evidence presented at a § 27-404 hearing or to otherwise pass on the credibility of the witnesses who testified. See *State v. Kofoed, supra*. Rather, we must view the evidence in the light most favorable to the prosecution. See *id.* Upon our review of the offered testimony, we find that a rational fact finder could have determined with

a firm conviction that Johnson made threatening statements to Rodriguez and Hardy. Accordingly, the district court did not abuse its discretion in admitting the testimonies of Rodriguez and Hardy.

## 5. Double Jeopardy

Johnson argues that the consecutive sentences imposed by the district court for count VII (discharge of a firearm in a city of the first class) and count VIII (use of a deadly weapon to commit a felony) violate the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions. The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution provides, "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ." "The 5th Amendment's protection against double jeopardy applies to states through the 14th Amendment to the U.S. Constitution." *State v. Bedolla*, 298 Neb. 736, 742-43, 905 N.W.2d 629, 634 (2018). Johnson contends that because the statutes pertinent to discharge of a firearm and use of a deadly weapon (firearm) to commit a felony "have the same elements," imposing punishment for both offenses violates double jeopardy. Brief for appellant at 35. Johnson suggests that our analysis should center on the "statutory elements test" of *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), which calls for "comparing the elements of each crime of which [a] defendant is convicted." Brief for appellant at 34. However, as discussed below, it is unnecessary to engage in such an analysis.

[23-25] The Double Jeopardy Clause protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997). "The protection provided by Nebraska's double jeopardy clause is coextensive with that provided by the U.S. Constitution." *State v. Dragoo*, 277 Neb. 858, 862, 765 N.W.2d 666, 670 (2009) (under *Blockburger*, where same act

or transaction constitutes violation of two distinct statutory provisions, test to determine whether there are two offenses or only one is whether each provision requires proof of fact which other does not). See, also, *Whalen v. United States*, 445 U.S. 684, 689, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980) (Double Jeopardy Clause at "very least precludes federal courts from imposing consecutive sentences unless authorized by Congress to do so"; power to define criminal offenses and prescribe punishments to be imposed reside wholly with Congress). "[W]here two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." *Whalen v. United States*, 445 U.S. at 692.

At issue are Johnson's convictions for discharge of a firearm in a city of the first class (count VII), a Class IC felony, in violation of § 28-1212.04, and a corresponding count of use of a deadly weapon to commit a felony (count VIII), also a Class IC felony, in violation of § 28-1205(1)(a) and (c). Section 28-1212.04 states, in relevant part:

> Any person, within . . . any city of the first class . . . who unlawfully, knowingly, and intentionally or reck-lessly discharges a firearm, while in any motor vehicle or in the proximity of any motor vehicle that such person has just exited, at or in the general direction of any person, dwelling, building, structure, [or] occupied motor vehicle . . . is guilty of a Class IC felony.

Section 28-1205 provides, in relevant part:

> (1)(a) Any person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony.
>
> (b) Use of a deadly weapon, other than a firearm, to commit a felony is a Class II felony.
>
> (c) Use of a deadly weapon, which is a firearm, to commit a felony is a Class IC felony.

. . . .

(3) The crimes defined in this section shall be treated as separate and distinct offenses from the felony being committed, and sentences imposed under this section shall be consecutive to any other sentence imposed.

. . . .

(5) For purposes of this section:

. . . .

(b) Use of a deadly weapon includes the discharge, employment, or visible display of any part of a firearm, a knife, brass or iron knuckles, any other deadly weapon, or a destructive device during, immediately prior to, or immediately after the commission of a felony or communication to another indicating the presence of a firearm [or] any other deadly weapon, . . . immediately prior to, or immediately after the commission of a felony, regardless of whether such firearm [or other] deadly weapon, or destructive device was discharged, actively employed, or displayed.

Johnson argues that the statutory elements of counts VII and VIII are identical, insofar as the "use" of the firearm in this case resulted from Johnson's "discharge" of that same firearm in a city of the first class. Brief for appellant at 34. He asserts, "[I]t is hard to envision a situation where the firearm's discharge is not a use of the firearm. One cannot discharge a firearm without using it." *Id*. Since "[b]oth statutes have the same elements," *id*. at 35, he contends that under the statutory elements test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), he may not be consecutively sentenced for discharging a firearm in a city of the first class and use of that same firearm to commit a felony. Notably, Johnson does not address § 28-1205(5)(b), other than briefly referencing it to say that it "defines 'use' to include discharge." Reply brief for appellant at 7. However, as set forth above, § 28-1205(5)(b) specifically states that "[u]se of a deadly weapon includes the discharge, employment, or

visible display of any part of a firearm, . . . during, immediately prior to, or immediately after the commission of a felony . . . regardless of whether such firearm . . . was discharged, actively employed, or displayed." Based on that statutory language, merely employing or displaying any part of a firearm immediately prior to, during, or immediately after committing the underlying offense of discharging a firearm constitutes use of a deadly weapon regardless of whether the firearm was discharged, actively employed, or displayed. Therefore, while Johnson's assertion that "it is hard to envision a situation where the firearm's discharge is not a use of the firearm," brief for appellant at 34, may be true, it does not necessarily follow that the use of a firearm requires the discharge of that firearm.

[26,27] Regardless, "the *Blockburger* test does not apply when there is clear legislative intent regarding whether conduct involves a single offense or multiple offenses." *State v. Ballew*, 291 Neb. 577, 590, 867 N.W.2d 571, 582 (2015) (*Blockburger* test is aid to statutory interpretation and is not controlling where there is clear indication of legislative intent). "[W]hen the Legislature has demonstrated an intent to permit cumulative punishments, the Double Jeopardy Clause is not violated as long as the court imposes the cumulative punishments in a single proceeding." *State v. Dragoo*, 277 Neb. 858, 864, 765 N.W.2d 666, 671 (2009). See, also, *State v. Mata*, 273 Neb. 474, 481, 730 N.W.2d 396, 401-02 (2007) (statute establishing crime of using deadly weapon to commit felony expressly provides Legislature intended such use remain independent offense from underlying felony; "'no question that the Legislature intended that one using a deadly weapon be subjected to cumulative punishments for committing the underlying felony and for the use of the weapon to commit it'").

The Nebraska Supreme Court has previously rejected Johnson's argument that separate punishment for discharging and using the same firearm violates the Double Jeopardy

Clause. In *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997), the appellant claimed that he was twice put in jeopardy by being separately punished for both discharging and using the same firearm. The Nebraska Supreme Court held that the Double Jeopardy Clause did not bar cumulative punishments for unlawful discharge of a firearm under Neb. Rev. Stat. § 28-1212.02 (Reissue 1995) and use of a firearm to commit a felony under § 28-1205 (Reissue 1995). In so holding, the court reiterated that "'[i]f the statute clearly and affirmatively indicates that the legislature intended that the defendant be punished cumulatively under both charges and the sentences for both charges are imposed in a single trial, the Double Jeopardy Clause is not offended.'" *State v. McBride*, 252 Neb. at 882, 567 N.W.2d at 147 (quoting *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996)).

*McBride* observed that § 28-1205(3) provided that the "crime of using a deadly weapon to commit a felony 'shall be treated as [a] separate and distinct [offense] from the felony being committed, and sentences imposed under this section shall be consecutive to any other sentence imposed.'" *State v. McBride*, 252 Neb. at 882, 567 N.W.2d at 147. The court further noted that "the crime of using a deadly weapon to commit a felony applies to '[a]ny person who uses a firearm . . . to commit any felony.'" *State v. McBride*, 252 Neb. at 882, 567 N.W.2d at 147 (quoting § 28-1205(1)). Based on this statutory language, the Nebraska Supreme Court concluded that "there can be no question that the Legislature intended that one using a deadly weapon be subjected to cumulative punishments for committing the underlying felony and for the use of the weapon to commit it." *State v. McBride*, 252 Neb. at 882, 567 N.W.2d at 147. The court determined that the separate sentences imposed for discharging and using the same firearm did not violate the Double Jeopardy Clause.

[28] Notably, § 28-1205 was not amended for more than a decade after the Nebraska Supreme Court's decision in *McBride*, thus indicating the Legislature's acceptance of the

court's determination of its intent. See *Drought v. Marsh*, 304 Neb. 860, 937 N.W.2d 229 (2020) (where statute has been judicially construed and that construction has not evoked amendment, it will be presumed that Legislature acquiesced to court's determination of Legislature's intent). However, in 2009, § 28-1205 underwent several revisions. Section 28-1205(1) previously included both "use[]" and "possess[ion]" of a deadly weapon, but the 2009 amendment moved possession of a deadly weapon to its own section and imposed lower felony classifications to "possession" offenses compared to "use" offenses. Importantly, § 28-1205(3) (Reissue 2016) remained unchanged, leaving intact the treatment of use and possession of a deadly weapon as separate and distinct offenses from the felony being committed and also leaving intact the requirement that sentences be consecutive to any other sentence imposed. Finally, § 28-1205(5)(b), set forth previously, was added to the statute. The Legislature's retention of § 28-1205(3) and its addition of § 28-1205(5)(b) confirmed its intent to make use of a firearm a separate offense from discharge of a firearm.

[29] Regarding § 28-1212.02, the unlawful discharge of a firearm statute at issue in *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997), we note that it was minimally modified in 2009, primarily to change the offense's classification from a Class III felony to a Class ID felony. Section 28-1212.04, the unlawful discharge of a firearm statute applicable in this case, was enacted post-*McBride* in 2009; it created a separate offense for discharge of a firearm in certain cities and counties and made the offense a more serious Class IC felony. Notably, the Legislature did not include in § 28-1212.04 any language creating an exception to § 28-1205(3), which, as discussed, had previously been interpreted by the Nebraska Supreme Court to require treating use of a firearm to commit a felony as a separate and distinct offense from the felony being committed, specifically the offense of discharging a firearm, and to require that sentences imposed be consecutive. Accordingly, we construe §§ 28-1212.04 and 28-1205(3) pursuant to the

holding in *McBride* construing §§ 28-1212.02 and 28-1205(3) (Reissue 1995). Therefore, any person committing the felony of discharging a firearm in a city of the first class shall be subjected to cumulative punishments in a single proceeding for both the offense of discharging a firearm and the offense of using a deadly weapon (firearm) to commit that felony. See *State v. McBride, supra*.

[30] Further analysis under *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), is not necessary. See *State v. Franco*, 257 Neb. 15, 594 N.W.2d 633 (1999) (where Legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those statutes proscribe "same" conduct under *Blockburger*, court's task of statutory construction ends and cumulative punishment under such statutes in single trial may be imposed). Accordingly, we find no error in the sentences imposed by the district court.

## VI. CONCLUSION

For the reasons set forth above, we find that the district court did not err in its evidentiary rulings and in sentencing Johnson. Accordingly, we affirm Johnson's convictions and sentences.

Affirmed.